01-1535-cr(L) (5th A)
In re Terrorist Bombings of U.S. Embassies (Fifth Amendment Challenges)

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: December 10, 2007                     Decided: November 24, 2008)

Docket Nos. 01-1535-cr (L), 01-1550-cr (con), 01-1553-cr (con),
01-1571-cr (con), 05-6149-cr (con), 05-6704-cr (con)

In re TERRORIST BOMBINGS OF U.S. EMBASSIES IN EAST AFRICA (FIFTH AMENDMENT CHALLENGES),

UNITED STATES OF AMERICA,

        *Appellee*,
     v.

MOHAMED SADEEK ODEH, also known as Abu Moath, also known as Noureldine, also known as Marwan, also known as Hydar, MOHAMED RASHED DAOUD AL-'OWHALI, also known as Khalid Salim Saleh Bin Rashed, also known as Moath, also known as Abdul Jabbar-Ali Abel-Latif, WADIH EL HAGE also known as Abdus Sabbur,

        *Defendants-Appellants*,

KHALFAN KHAMIS MOHAMED, also known as Khalfan Khamis,

        *Defendant.*

Before: FEINBERG, NEWMAN, and CABRANES, *Circuit Judges*.

Defendants appeal from judgments of conviction entered by the United States District Court for the Southern District of New York (Leonard B. Sand, *Judge*) following a jury trial in which they were found guilty of offenses arising from their involvement in an international conspiracy—led by Osama Bin Laden and organized through the al Qaeda terrorist network—to kill American citizens and destroy American facilities across the globe. Defendants-appellants Al-'Owhali and Odeh contend, *inter alia*, that certain inculpatory statements should have been suppressed from their trial primarily because they

1

were obtained in violation of the Fifth Amendment.  We see no merit in this challenge and affirm their convictions for the reasons stated in this opinion and in *In re Terrorist Bombings of U.S. Embassies in East Africa*, __ F.3d __ (2d Cir. 2008) filed today.

DAVID RASKIN and LESLIE C. BROWN, Assistant United States Attorneys (Michael J. Garcia, United States Attorney, *on the brief,* Iris Lan, David O'Neil, Katherine Polk Failla, Celeste L. Koeleveld, Assistant United States Attorneys, *of counsel*), United States Attorney's Office for the Southern District of New York, New York, NY, *for Appellee United States of America.*

JAMES E. NEUMAN, New York, NY, *for Defendant-Appellant Mohamed Sadeek Odeh.*

FREDERICK H. COHN, New York, NY, *for Defendant-Appellant Mohamed Rashed Daoud Al-'Owhali.*

JOSHUA L. DRATEL and SAM A. SCHMIDT (Erik B. Levin, Renita K. Thukral, Meredith S. Heller, *of counsel*), New York, NY, *for Defendant-Appellant Wadih El Hage.*

JOSÉ A. CABRANES, *Circuit Judge*:

Defendants-appellants Mohamed Rashed Daoud Al-'Owhali and Mohamed Sadeek Odeh challenge their convictions in the United States District Court for the Southern District of New York (Leonard B. Sand, *Judge*) on numerous charges arising from their involvement in the August 7, 1998 bombings of the American Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania (the "August 7 bombings").[1]  In this opinion we consider their challenges to the District Court's rulings that denied, for the most part, their respective motions to suppress statements each of them made overseas to U.S. and non-U.S. officials.  Other challenges and those of their co-defendant, Wadih El-Hage, are

---

[1] For a detailed description of the factual background and procedural history of this case, see *In re Terrorist Bombings of U.S. Embassies in East Africa*, __ F.3d __ (2d Cir. 2008).

2

considered in two separate opinions filed today, *In re Terrorist Bombings of U.S. Embassies in East Africa*, __ F.3d __ (2d Cir. 2008), and *In re Terrorist Bombings of U.S. Embassies in East Africa (Fourth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008).

Al-'Owhali and Odeh contend that neither the "Advice of Rights" form ("AOR") that they received nor the subsequent oral warnings of an Assistant United States Attorney ("AUSA") satisfied *Miranda v. Arizona*, 384 U.S. 436 (1966). In addition, Al-'Owhali asserts that the conditions of his confinement made his statements involuntary and therefore inadmissible under the Fifth Amendment.[2] He also contends that the District Court abused its discretion by withdrawing its initial grant of his suppression motion and holding further hearings pursuant to the government's application. For his part, Odeh claims that his Fifth and Sixth Amendment rights were violated when the District Court permitted him to withdraw his initial suppression motion and his attorneys failed to renew that motion promptly thereafter.

As explained in greater detail below, all of these claims lack merit. The AUSA's oral warnings fulfilled, and the AOR substantially complied with, the government's obligations, insofar as it had any, under *Miranda*, and the admission of Al-'Owhali's and Odeh's statements did not otherwise run afoul of the Fifth Amendment. The District Court's decision to conduct further hearings on Al-'Owhali's suppression motion was well within its discretion, as was its decision to grant, without prejudice to renewal, Odeh's application to withdraw his initial suppression motion. Accordingly, the District Court's resolution of Al-'Owhali's and Odeh's respective motions did not violate any of their constitutional rights.

---

[2] In relevant part, the Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

## I.    BACKGROUND

**A.    Factual Overview**

1.    Al-'Owhali

Al-'Owhali was detained on August 12, 1998 by Kenyan authorities in "an arrest [that] was valid under Kenyan law." *United States v. Bin Laden*, 132 F. Supp. 2d 168, 173 (S.D.N.Y. 2001).  Within one hour of his arrest, Al-'Owhali was transported to Kenyan police headquarters in Nairobi and interrogated by two members of the Joint Terrorist Task Force—an FBI Special Agent and a New York City police detective—operating out of New York City and two officers of Kenya's national police. *Id.*  The New York police detective presented Al-'Owhali with an Advice of Rights form often used by U.S. law enforcement when operating overseas.  The AOR, written in English, read in its entirety as follows:

> We are representatives of the United States Government.  Under our laws, you have certain rights.  Before we ask you any questions, we want to be sure that you understand those rights.
>
> You do not have to speak to us or answer any questions.  Even if you have already spoken to the Kenyan authorities, you do not have to speak to us now.
>
> If you do speak with us, anything that you say may be used against you in a court in the United States or elsewhere.
>
> In the United States, you would have the right to talk to a lawyer to get advice before we ask you any questions and you could have a lawyer with you during questioning. In the United States, if you could not afford a lawyer, one would be appointed for you, if you wish, before any questioning.
>
> Because we are not in the United States, we cannot ensure that you will have a lawyer appointed for you before any questioning.
>
> If you decide to speak with us now, without a lawyer present, you will still have the right to stop answering questions at any time.
>
> You should also understand that if you decide not to speak with us, that fact cannot be used as evidence against you in a court in the United States.

> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

*Id.* at 173-74. Al-'Owhali told the American law enforcement agents that he could not read English and had a limited understanding of spoken English. *Id.* at 174. Accordingly, the police detective "read the AOR aloud in English, going slowly and checking for visual signs of comprehension. Al-'Owhali appeared to [the detective to] understand, replied that he understood when asked, and signed his alias at the bottom of the AOR in Arabic when requested to do so."[3] *Id.* A one-hour interrogation ensued, in which Al-'Owhali responded in "broken English." *Id.*

Finding their ability to communicate with Al-'Owhali limited by the end of that hour, the agents decided to continue Al-'Owhali's interrogation with the assistance of an interpreter. The special agent began this interview by reading the AOR in English, which the interpreter translated into Arabic. *Id.* Al-'Owhali stated that he "understood that the warning was the same one as from the morning session," "understood his rights as described therein," and "agreed to answer questions." *Id.* Al-'Owhali was then interviewed for about three hours and, thereafter, was questioned on eight other days: August 13, 14, 17, and 21-25.[4] *Id.* At the start of each of the interviews on August 13, 14, 17 and 21, the agents showed Al-'Owhali the signed AOR, asked whether he remembered his rights, and whether he would continue to answer their questions. *Id.* at 175. Al-'Owhali consented on each occasion. Until August 21, he denied any involvement in the embassy bombings. *Id.*

During the August 21 interview, the U.S. agents described the inculpatory evidence they had gathered on Al-'Owhali, and "[a]fter acknowledging that the agents 'knew everything,' Al-'Owhali said

---

[3] An FBI interpreter, who attended many of the relevant interrogations, later testified that "in his opinion, Al-'Owhali would likely have had difficulty understanding the AOR if it were only read to him aloud in English." *Bin Laden*, 132 F. Supp. 2d at 174.

[4] The interviews lasted between two and four hours, with the exception of the interviews on August 22 and August 25, which lasted seven and nine hours respectively. *See Bin Laden*, 132 F. Supp. 2d at 174, 177.

that he would tell the truth about his involvement in the bombing if he could be tried in the United

States." *Id.* at 176. He explained that the reason he wanted to stand trial in the United States was

"because the United States was his enemy, not Kenya." *Id.* The agents then terminated the interview

in order to determine whether Al-'Owhali's request could be met. The next day, August 22, an AUSA,

in the company of the two U.S. agents and two Kenyan police officers, provided Al-'Owhali with a

document of understanding ("DOU"), approved by the U.S. Department of Justice, stating:

> I . . . have been fully advised of my rights, including my right to remain silent and my right not
> to answer questions without a lawyer present. As I have been previously told, I understand that
> anything I say or have said can be used against me in court in the United States. I also
> understand that if I choose not to answer questions my refusal to answer questions cannot be
> held against me in court. I further understand that if I choose to answer questions, I can always
> change my mind and decide not to answer any further questions.
>
> I understand that both Kenyan and American authorities are investigating the murder of the
> various American and Kenyan victims in and around the United States [E]mbassy in Nairobi.
>
> I have a strong preference to have my case tried in an United States Court because America is
> my enemy and Kenya is not. I would like my past and present statements about what I have
> done and why I have done it to be aired in public in an American courtroom. I understand that
> the American authorities who are interviewing me want to know who committed the bombing
> of the embassy and how it was carried out.
>
> I am willing to waive my rights and answer the questions of American authorities upon the
> condition that the undersigned law enforcement authorities make all best efforts to see that I
> am brought to the United States to stand trial. I understand that the undersigned prosecutor is
> only empowered to make recommendations to the Attorney General of the United States and
> other executive officials of the United States Government and I further understand that the
> United States Government only intends to act with the mutual agreement of the Kenyan
> government.
>
> No other agreements or promises have been made other than as set forth in this document.

*Id.* at 176.

After being shown this document, but before it was read to him, Al-'Owhali indicated that "he

might wish to have an attorney review the DOU to make sure it was enforceable." *Id.* In response, the

AUSA, through a translator, advised Al-'Owhali of his *Miranda* rights, "recited entirely from [the

6

AUSA's] memory of a domestic *Miranda* warning" and without "reference to the AOR utilized on the

first day of interrogation." *Id.* Specifically, the AUSA informed Al-'Owhali:

> that he had the right to remain silent; that he had the right "to have an attorney present during
> this meeting;" that even if Al-'Owhali decided to talk he could always change his mind later;
> that Al-'Owhali's statements could be used against him in court, though the fact of his silence
> could not. AUSA [redacted] also said that he was an attorney for the U.S. government, not for
> Al-'Owhali. It was repeatedly stressed to Al-'Owhali that he was the "boss" at all times as to
> whether he wished to answer questions without a lawyer present.

*Id.* at 176-77 (redaction signal in original). The AUSA further explained that no American lawyer was

available at that time in Kenya. *Id.* at 177. After Al-'Owhali stated that he understood his rights, the

AUSA read the DOU to Al-'Owhali, through a translator, verifying after each paragraph that Al-

'Owhali understood the contents of the document. *Id.* Al-'Owhali did not "assert his rights" or object

to any provision of the DOU except for the "uncertainty associated with [the paragraph indicating that

U.S. officials would make] just a 'recommendation' that he be brought to the United States." *Id.* The

AUSA agreed to investigate the possibility of accommodating Al-'Owhali's request, and before exiting

the room to consult with his superiors at the Department of Justice, verified (twice) that Al-'Owhali

was willing to proceed without counsel. *Id.*

During the AUSA's absence, Al-'Owhali withdrew his request, stating that "he would be willing

to talk even without a full guarantee because he trusted the U.S. officials to do the best they could to

bring him to the United States." *Id.* The AUSA then returned to the interview room, verified again

that Al-'Owhali was willing to proceed without counsel and, upon Al-'Owhali's request, handed him

the DOU to sign. *Id.* Al-'Owhali signed the statement, after explaining that the document would have

to be amended to include his true name and nationality. *Id.* He was then interrogated for the next

three-and-a-half hours; after that, he was interrogated for three hours on August 23 and 24, and for

nine hours on August 25. *Id.* During these interviews, Al-'Owhali admitted his participation in the

bombing of the American Embassy in Nairobi. *Id.*

During the August 25 interrogation, Al-'Owhali claimed that he possessed "time-sensitive information regarding an issue of public safety" and would disclose this information only if he was guaranteed a trial in the United States rather than Kenya. *Id.* Accordingly, the AUSA, after obtaining the necessary approvals, prepared a second document of understanding ("second DOU"), which read:

> I . . . have been fully advised of my rights, including my right to remain silent and my right not to answer questions without a lawyer present. As I have been previously told, I understand that anything I say or have said can be used against me in court in the United States. I also understand that if I choose not to answer questions my refusal to answer questions cannot be held against me in court. I further understand that if I choose to answer questions, I can always change my mind and decide not to answer any further questions.

> I have answered a number of questions of the American authorities and have provided truthful information after initially providing incorrect information. However, I have also indicated that there is additional information that I have which I stated I would share with the United States authorities upon my arriving in America and obtaining an attorney. I have also indicated that the information concerns a public safety issue. Because I would otherwise not make this disclosure before arriving in the United States and speaking to an attorney, but because American authorities do not wish to take the risk that the delay concerning the information I intend to impart later will cause loss of life, it is hereby agreed that I will tell the United States authorities about this information prior to returning to America. In turn, the American authorities agree not to use the fact that I disclosed this particular information against me as evidence in the Government's case in chief if I should demand a trial of the charges that will be filed against me. I understand that the United States intends to pursue appropriate investigative leads based upon this information I am now agreeing to provide. I also understand that the United States is free to use any evidence gained in following up the investigative leads but will not advise any jury that hears my case of the fact that I revealed this particular information to the United States government, unless: (1) I testify falsely (or otherwise elicit false or misleading evidence or testimony) and revealing this fact will serve to correct false or misleading evidence; or (2) I request that the jury be advised of the fact that I disclosed this particular information and the Court overrules objection, if any, by the Government. The Government hereby agrees that if the Defendant is convicted, the Government will disclose the fact that I provided this information to the judge or jury determining or imposing sentence if requested to do so by the defendant. There is no promise that providing such information will affect my sentence.

> No other agreements or promises have been made other than as set forth in this document and the prior agreement dated August 22, 1998.

> I have decided to sign this document because I have been advised by the undersigned that I am now scheduled to be removed to the United States within the next 24 hours, travel conditions permitting, and the undersigned is aware of no objections from either the United States or Kenya governments to such removal.

8

*Id.* at 177-78. The AUSA read the second DOU to Al-'Owhali, through a translator, and then Al-'Owhali signed it. *Id.* at 178. After the Kenyan police left the room, at Al-'Owhali's request, he disclosed the time-sensitive information to the U.S. agents. *Id.* The next morning, Al-'Owhali was flown from Kenya to the United States and, during the flight, was again advised of his *Miranda* rights. Al-'Owhali "stated that he knew his rights, signed the advice of rights form, and invoked his right to appointed counsel." *Id.*

        2.     Odeh

On August 7, 1998, Pakistani immigration officials detained Odeh, following his arrival at the Karachi airport on a flight from Kenya, on the ground that he used a false passport. *United States v. Bin Laden*, 132 F. Supp. 2d 198, 202 (S.D.N.Y. 2001). Odeh was held in Pakistani custody until August 14, during which time he was interrogated by Pakistani officials. *Id.* On August 14, Odeh was transported to Nairobi, Kenya, and transferred from Pakistani custody to Kenyan custody. *Id.* The next day, he was interrogated by two special agents of the FBI, an AUSA, and three Kenyan police officers. *Id.* at 203. Odeh communicated with his interrogators, without difficulty, entirely in English. *Id.* The U.S. officials explained to Odeh that whether or not he spoke with Pakistani authorities during his detention in Karachi had no bearing on his decision to speak to them. *Id.* "Thereafter, when Odeh raised the issue of his admissions to the Pakistani authorities, he was told that the Americans did not know or care about what had transpired in Pakistan." *Id.* One of the FBI special agents read Odeh an AOR similar in all material respects to the one read to Al-'Owhali:

> We are representatives of the United States Government. Under our laws, you have certain rights. Before we ask you any questions, we want to be sure that you understand those rights.
>
> You do not have to speak to us or answer any questions. Even if you have already spoken to the Pakistani authorities, you do not have to speak to us now.
>
> If you do speak with us, anything that you say may be used against you in a court in the United States or elsewhere.

9

> In the United States, you would have the right to talk to a lawyer to get advice before we ask you any questions and you could have a lawyer with you during questioning. In the United States, if you could not afford a lawyer, one would be appointed for you, if you wish, before any questioning.
>
> Because we are not in the United States, we cannot ensure that you will have a lawyer appointed for you before any questioning.
>
> If you decide to speak with us now, without a lawyer present, you will still have the right to stop answering questions at any time.
>
> You should also understand that if you decide not to speak with us, that fact cannot be used as evidence against you in a court in the United States.
>
> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

*Id.* As the FBI special agent read the AOR, Odeh asked about the availability of a lawyer but did not specifically request one. *Id.* After further discussion of the AOR and Odeh's willingness to speak to U.S. officials, the interview temporarily ceased so that the AUSA could investigate whether Kenyan counsel was available to Odeh. *Id.* at 204.

Believing that Odeh lacked financial resources, the AUSA inquired into the availability of appointed—but not privately retained—Kenyan counsel. *Id.* A "high-ranking" Kenyan law enforcement officer informed the AUSA that under Kenyan law, appointed counsel was not provided at the investigative stage and it was their "practice to continue questioning a person who requests an appointed attorney." *Id.* The AUSA informed Odeh of what he had learned from the Kenyan police officer, verified that Odeh had not already retained an attorney, and then orally informed him of his rights under *Miranda*:

> Odeh was told that he had the right to remain silent and that invocation of the right to silence could not be used against him in court. He was also told that if he did speak to the American officials, statements that he made could be used against him. With respect to the right to counsel, AUSA [redacted] told Odeh that he was entitled to have an attorney present and to have an attorney appointed if he could not afford one. However, AUSA [redacted] informed

10

> Odeh that no American attorney was currently available to represent him in Kenya. AUSA [redacted] emphasized that Odeh was "the boss" with respect to answering questions without an attorney present.

*Id.* (redaction signals in original). The AUSA explained that Odeh could (1) exercise his right to remain silent; (2) invoke his right to have an attorney present, in which case the Americans would leave the room and he could then decide whether or not to speak with the Kenyan police; or (3) speak to both the American and Kenyan authorities without the presence of an attorney. *Id.* Odeh suggested a fourth possibility: "speaking with the American officials outside the presence of the Kenyans." *Id.* While the U.S. and Kenyan authorities were investigating the viability of Odeh's proposal, Odeh changed his mind and decided to speak to both the U.S. and Kenyan officials. *Id.* Odeh then signed the AOR. *Id.* Odeh never stated a desire to hire an attorney, and "[i]n fact, he asked the officials what would happen if he subsequently decided that he did not want to speak without a lawyer present." *Id.* In response, the AUSA "informed him that he always had the right to stop talking with the American officials." *Id.* at 204-05.

After signing the AOR on August 15, Odeh was interviewed for about seven hours. *Id.* During the interrogation the next day, the AUSA again informed Odeh that he had the right to the presence of an attorney at the interview, even though no American attorney was available, and that if Odeh wanted an attorney, the Americans would not interrogate him. *Id.* at 205. Odeh expressed his willingness to answer questions and did not request an attorney, but he did make inquiries into the status of property confiscated upon his arrest. *Id.* Odeh was interrogated on a daily basis from approximately 9:00 a.m. to 6:00 p.m. until he was taken to the United States on August 27, 1998. *Id.* During these sessions, "Odeh admitted that he was a member of al Qaeda but denied any participation in (or foreknowledge of) the embassy bombings." *Id.* When Odeh was transferred to American custody on August 27, he was given the standard *Miranda* warnings. *Id.*

11

**B.      Al-'Owhali's and Odeh's Pretrial Suppression Motions**

On June 20, 2000, Odeh filed a motion to suppress, *inter alia*, statements that he made to U.S. officials in Kenya and to Pakistani law enforcement agents in Pakistan, on the grounds that the statements were made involuntarily and, with respect to the statements made to U.S. officials, pursuant to an inadequate *Miranda* warning.[5]  *See Bin Laden*, 132 F. Supp. 2d at 201.  In support of this motion, Odeh filed a sworn affidavit.  *Id.*  Shortly thereafter, Odeh expressed reservations about this motion in letters to the District Court and the government.  *Id.* at 201 & n.3.  In response, the District Court held a sealed and *ex parte* hearing on August 1, 2000 at which "it became clear that Odeh wished to withdraw his affidavit on grounds relating to his religious beliefs."  *Id.* at 201.  The District Court permitted Odeh to do so and "deem[ed] as similarly withdrawn the motion to suppress itself, but . . . granted [leave] for Odeh's counsel to renew the suppression motion in a way that did not rely on Odeh's own affidavit."  *Id.*  Odeh's counsel did not renew the suppression motion for over five months.

In the interim, Al-'Owhali moved to suppress, *inter alia*, statements that he made to U.S. officials while held in the custody of Kenyan authorities, on the ground that the statements were obtained in violation of the Fifth Amendment.[6]  *See Bin Laden*, 132 F. Supp. 2d at 171-72.  In a sealed opinion dated January 9, 2001, the District Court granted Al-'Owhali's motion because of its determinations that the AOR presented to Al-'Owhali did not satisfy the requirements of *Miranda* and, under the circumstances, Al-'Owhali's statements were not made voluntarily.  The next day, January 10, Odeh re-filed his previously withdrawn motion to suppress the statements that he made in Kenya and, on January 18, moved to suppress the statements that he made in Pakistan.  *Bin Laden*, 132 F. Supp. 2d

---

[5] Odeh also moved to suppress "evidence seized during a search of his residence in Witu, Kenya," *Bin Laden*, 132 F. Supp. 2d at 201, but he does not press that issue on appeal.

[6] Al-'Owhali also sought suppression of an out-of-court witness identification, *Bin Laden*, 132 F. Supp. 2d at 172, which is not at issue on this appeal.

12

at 201.  Both motions were supported by sworn affidavits executed by Odeh.[7]  *Id.*  At the same time, the government moved for (1) reconsideration of the District Court's January 9 ruling granting Al-'Owhali's motion and (2) reopening of the suppression hearing on that motion.  *Bin Laden*, 132 F. Supp. 2d at 172.  The District Court granted the government's motions and withdrew its opinion granting Al-'Owhali's motion because the "[g]overnment's proffer sufficiently indicated the need to further develop the factual record."  *Id.*  After conducting a hearing on the circumstances of both Al-'Owhali's and Odeh's overseas detention, the District Court resolved the suppression motions in two opinions issued on February 13, 2001.[8]

## C.      The District Court's Rulings on the Motions

The District Court granted in part and denied in part Al-'Owhali's motion and denied in full Odeh's motions.[9]  The Court held that the oral warning given to Al-'Owhali satisfied *Miranda* but the AOR did not fully comply with *Miranda*.  Because Al-'Owhali made statements prior to receiving that oral warning, his motion was granted as to those un-warned statements but denied as to the statements made after the oral warning.  Odeh's motion to suppress statements made in Pakistan was denied as untimely, and his motion to suppress statements made after receiving an oral *Miranda* warning and waiving his rights was denied on the merits.

---

[7] Odeh explained that his willingness to file these affidavits was based on the success of Al-'Owhali's suppression motion, which left him "convinced that these limited issues can be raised without running afoul of [his] deeply held religious beliefs." *Bin Laden*, 132 F. Supp. 2d at 201.

[8] These opinions—*Bin Laden*, 132 F. Supp. 2d 168, and *Bin Laden*, 132 F. Supp. 2d 198—were initially filed under seal, but then filed publicly in redacted form on February 16, 2001.

[9] The new evidence presented by the government in support of its motion for reconsideration included the testimony of both the FBI Special Agent and the AUSA who interrogated Al-'Owhali in Kenya, the testimony of the FBI Language Specialist who provided Arabic translation services during most of Al-'Owhali's interrogation, and numerous stipulations, documents, and affidavits. *Bin Laden*, 132 F. Supp. 2d at 172. Based on this new evidence, the District Court made the findings of fact described herein.

1.      Al-'Owhali

Turning first to Al-'Owhali's motion, the District Court found the following facts related to the conduct of Al-'Owhali's interrogators and the conditions of his confinement: (1) Al-'Owhali was held for fourteen days by Kenyan authorities in "incommunicado detention"—that is, without communication with anyone outside the prison; (2) his cell for the first two days, which he shared with another detainee, was ten-feet-by-eleven-feet, with a two-foot-by-five-foot window and a concrete bed; (3) his cell for the other twelve days was sixty-four square feet, containing a thin mat and at least one blanket; (4) Al-'Owhali was never handcuffed during the interviews; (5) the interviews were held in a "library-like room"; (6) "frequent" breaks were allowed for prayer, eating, and using the restroom; (7) the agents provided bottled water upon request, as well as food; (8) U.S. officials made no threats or promises; and (9) Al-'Owhali received medical care as needed. *Bin Laden*, 132 F. Supp. 2d at 178-79. The District Court also observed that "Al-'Owhali ha[d] two years of university education and significant military experience" and that "[a]t the time of the interrogations, Al-'Owhali had a basic understanding of spoken English [and] would sometimes answer the simpler questions posed to him before the Arabic interpreter had even finished translating [them]." *Id.* at 179.

Recognizing that Al-'Owhali's motion presented a question of first impression, the District Court held that both the Fifth Amendment privilege against self-incrimination and a form of the *Miranda* rule applied to the determination of "the admissibility of a defendant's admissions at his criminal trial in the United States, where that defendant is a non-resident alien and his statements were the product of an interrogation conducted abroad by U.S. law enforcement representatives." *Id.* at 181.

With respect to the applicability of the Fifth Amendment's privilege against self-incrimination, the District Court rejected the government's characterization of the issue as one of "extraterritorial application," explaining that "any violation of the privilege against self-incrimination occurs, not at the

14

moment law enforcement officials coerce statements through custodial interrogation, but when a defendant's involuntary statements are actually used against him at an American criminal proceeding." *Id.* at 181-82. The District Court explained that, based on the text of the Amendment, "these protections seemingly apply with equal vigor to all defendants facing criminal prosecution at the hands of the United States, and without apparent regard to citizenship or community connection." *Id.* This reading was confirmed, in the District Court's view, by "the Supreme Court's own explicit treatment of the privilege against self-incrimination as a 'fundamental trial right of criminal defendants,'" *id.* at 184 (quoting *United States v. Verdugo-Urquidez,* 494 U.S. 259, 264 (1990)), and because the animating purposes of the privilege against self-incrimination—*i.e.*, fairness, reliability, prevention of abuses—"are no less relevant when the criminal defendant at issue is an unconnected, non-resident alien," *id.* at 185. Accordingly, the District Court held that the Fifth Amendment's privilege against self-incrimination applied to Al-'Owhali notwithstanding his status as a "non-resident alien[ ] whose only connections to this country [are his] alleged crimes and . . . domestic prosecution therefor." *Id.*

Turning to the applicability of *Miranda*, the District Court held that, in prosecutions such as the one brought against Al-'Owhali, "a principled, but realistic application of *Miranda*'s familiar warning/waiver framework, in the absence of a constitutionally-adequate alternative, is both necessary and appropriate under the Fifth Amendment." *Id.* at 185-86. Referencing the *Miranda* Court's observation that "compulsion [was] inherent in custodial settings," *id.* at 186 (quoting *Miranda v. Arizona*, 384 U.S. 436, 458 (1966)), the District Court noted that "the inherent coerciveness of that police technique [*i.e.*, custodial interrogation] is clearly no less troubling when carried out beyond our borders and under the aegis of a foreign stationhouse," *id.* The District Court also relied on a line of cases recognizing that *Miranda* does not apply to overseas interrogations conducted by foreign police unless U.S. officials also take part in the questioning or use foreign officials as their agents. *Id.* at 187.

15

In the District Court's view, the existence of this "joint venture exception" to the admissibility of overseas statements taken in the absence of such warnings "is based on the assumption that *Miranda* must apply to any portion of an overseas interrogation that is, in fact or form, conducted by U.S. law enforcement." *Id.*

Having determined that the *Miranda* framework applied to overseas interrogations conducted by U.S. agents, the District Court set forth the content of the warnings a foreign detainee must receive. It found "uncontroversial" the requirements that a suspect be warned that "he has the right to remain silent . . . even if he has already spoken to the foreign authorities . . . [and] that anything he does say may be used against him in a court in the United States or elsewhere." *Id.* at 187-88. More difficult were the warnings related to the rights to presence and assistance of counsel because a suspect may not actually have those rights under the law in the country where he is detained and "[n]o constitutional purpose is served by compelling law enforcement personnel to lie or mislead subjects of interrogation." *Id.* at 188. In the District Court's judgment, the existence of these rights turned on foreign law but that dependency did not render these warnings inapplicable. It determined that "[t]o the maximum extent reasonably possible, efforts must be made to replicate what rights would be present if the interrogation were being conducted in America." *Id.* In effect, the District Court would require that "U.S. law enforcement . . . do the best they can to give full effect to a suspect's right to the presence and assistance of counsel, while still respecting the ultimate authority of the foreign sovereign." *Id.* at 188-89. With respect to these rights, the District Court proposed the following warning:

> Under U.S. law, you have the right to talk to a lawyer to get advice before we ask you any questions and you can have a lawyer with you during questioning. Were we in the United States, if you could not afford a lawyer, one would be appointed for you, if you wished, before any questioning.

16

Because you are not in our custody and we are not in the United States, we cannot ensure that you will be permitted access to a lawyer, or have one appointed for you, before or during any questioning.

However, if you want a lawyer, we will ask the foreign authorities to permit access to a lawyer or to appoint one for you. If the foreign authorities agree, then you can talk to that lawyer to get advice before we ask you any questions and you can have that lawyer with you during questioning.

If you want a lawyer, but the foreign authorities do not permit access at this time to a lawyer or will not now appoint one for you, then you still have the right not to speak to us at any time without a lawyer present.

*Id.* at 188 n.16.

The District Court then applied this standard of admissibility to Al-'Owhali's statements, holding that "the AOR is facially deficient in its failure to apprise [d]efendants accurately and fully of their right, under *Miranda*, to the assistance and presence of counsel if questioned by U.S. agents, even considering the fact that [d]efendants were in the custody of foreign authorities." *Id.* at 190. The AOR was misleading, in the District Court's view, because it informed detainees that, if they were in the United States, they would have the rights to the presence and assistance of counsel, but because they were abroad, those rights could not be guaranteed. The AOR, the District Court concluded, "wrongly convey[s] to a suspect that, due to his custodial situs outside the United States, he currently possesses no opportunity to avail himself of the services of an attorney before or during questioning by U.S. officials" and, therefore, "prematurely forecloses the significant possibility that the foreign authorities themselves may, if asked, either supply counsel at public expense or permit retained counsel inside the stationhouse." *Id.* In the District Court's view, the AUSA's oral recitation of a "traditional" *Miranda* warning at the August 22 interview accurately apprised Al-'Owhali of his rights and this warning cured the deficiencies of the AOR at the point it was administered. The District Court explained that the "AOR was flawed in its message that the right to counsel during an interrogation by U.S. agents was geographically based, . . . [but on] August 22 . . . Al-'Owhali was *explicitly apprised* that he had the right to

17

the presence of an attorney for purposes of the ensuing conversations." *Id.* at 192 (emphasis in original). Accordingly, the District Court concluded that, based on the AUSA's oral advice of rights, "beginning on August 22, Al-'Owhali was apprised of his rights in compliance with the requirements of *Miranda.*" *Id.*

The District Court also found, by a preponderance of the evidence, that Al-'Owhali made a knowing, intelligent, and voluntary waiver of his *Miranda* rights after having been so warned. *Id.* at 193. The Court found that the "the conditions of confinement, although non-ideal, were far from oppressive." *Id.* The District Court also observed that "Al-'Owhali's behavior during the interrogations subsequent to August 22 made it clear that he was quite aware who was the 'boss' as to whether statements would or would not be made without a lawyer present." *Id.* In addition, the District Court found that Al-'Owhali's decision to speak with U.S. officials "was not the product of any duress, threat, promise, or coercion by his interrogators" and that, by contrast, "there is evidence that Al-'Owhali regarded his sessions with [one of the special agents] as a cat-and-mouse game between trained professionals." *Id.* The District Court also clarified the basis for its changed view of the voluntariness of Al-'Owhali's actions, explaining that in its initial (and subsequently withdrawn) decision of January 9, 2001, it "thought Al-'Owhali's statements to be the product of a 'Hobson's choice' that supposedly pitted his continued silence in Kenya against his access to an American attorney." *Id.* at 194. In light of the additional evidence presented at the reopened suppression hearing, including the AUSA's testimony, the District Court concluded:

> [W]hat truly motivated Al-'Owhali to inculpate himself was his own overriding desire that he be tried in the United States. As he declared to the U.S. agents interviewing him, it was the United States which was his enemy, not Kenya. Particularly significant is the fact that the suggestion that he be tried in America was initiated entirely by Al-'Owhali. And when Al-'Owhali was dissatisfied by the less-than-firm assurances offered in the first DOU, he demanded that AUSA [redacted] do better. All of the above confirms [the Court's] belief that Al-'Owhali's decision to waive his rights and confess to the Americans was a decision borne of his own volition.

18

*Id.* (redaction signal in original).

For these reasons, the District Court granted Al-'Owhali's motion to suppress the statements that he made to U.S. officials prior to August 22 but denied the motion with respect to statements made after the oral warning and waiver of August 22. *Id.* at 192, 194.

2.      Odeh

With respect to the conditions of Odeh's overseas confinement, the District Court found that Odeh was held incommunicado in Kenyan custody for fourteen days, the maximum length of detention authorized by Kenyan law for individuals suspected of a capital offense. *Bin Laden*, 132 F. Supp. 2d at 205. The District Court also found that "there were no threats or promises made to [d]efendant Odeh in exchange for the statements that he made." *Id.* at 206. The Court also acknowledged that "[w]hile he was in Kenyan custody, [d]efendant Odeh's wife and brother-in-law were also detained and interviewed by the Kenyan [police]," and that Odeh was not allowed to speak with them. *Id.* at 206.

As to the personal characteristics relevant to this inquiry, the Court found that Odeh had three years of college-level education, principally in architecture and engineering, and that he had "spent several years in Afghanistan where he received military training and experience and where he served, for a time, as a medic." *Id.*

Turning to Odeh's Fifth Amendment claim, the District Court restated its holding with respect to Al-'Owhali's suppression motion: (1) the Fifth Amendment governed the admission of statements obtained overseas in a U.S. trial; (2) the *Miranda* warning/waiver framework applied to Odeh's overseas interrogation by U.S. officials; and (3) the AOR "used in Kenya as part of the embassy bombing investigation was facially deficient because it prematurely foreclosed the possibility that counsel would in fact be allowed inside the foreign stationhouse." *Id.* at 211. As with Al-'Owhali, the AUSA's oral warning cured the deficient AOR. *Id.* The District Court explained:

> The detailed and patient explanations given by AUSA [redacted] affirmatively communicated the message that, no matter what, Odeh possessed the right to insist on the assistance and presence of counsel for purposes of questioning by U.S. law enforcement. There was no indication that such a right only existed if Odeh was actually inside the United States. Admittedly, Odeh was told that neither an American nor a Kenyan appointed lawyer was currently available, but that information was simply the truth. *Miranda*, after all, is not served when police make misrepresentations. Moreover, what was perhaps available—a private Kenyan attorney—was never limited in any way. And by asking Odeh if he had Kenyan counsel already retained, AUSA [redacted] certainly alerted Odeh as to the existence of that possibility.

*Id.* at 212 (redaction signals in original). On the basis of this oral warning, the District Court concluded that Odeh had been informed of his *Miranda* rights "immediately after the administration of the written AOR and before any substantive questioning had yet taken place." *Id.*

The District Court also found "by a preponderance of the evidence, that Odeh made a valid waiver of his Miranda rights." *Id.* The waiver was knowing, in the District Court's view, because Odeh understood his rights, including his right to counsel, and "fully appreciated the fact that he was the 'boss' as to whether he would accede to questioning by Americans." *Id.* at 212-13. It was voluntary because Odeh "was driven to talk in order to distance himself from the embassy bombing" and not because of any compulsion. *Id.* at 213. Indeed, the District Court noted: "Odeh makes no claim that he was abused, mistreated, or threatened by either the Kenyans or Americans. He raises no complaint with respect to the objective conditions of his confinement [*e.g.*, the size of his cell or frequency of meals]. Nor does he allege that his personal characteristics made him unduly vulnerable." *Id.* His allegations of compulsion were instead based on (1) his "incommunicado detention" and (2) his fear of being left alone with the Kenyans if he invoked his right to counsel. *Id.* The District Court found neither argument persuasive, explaining (1) incommunicado detention "cannot be said to have induced his statements since he began confessing from the very first day of questioning"; and (2) his being left alone with Kenyan authorities without being questioned by U.S. agents "is precisely what *Miranda* requires: where no counsel is available, interrogation must cease." *Id.*

20

In light of these determinations, the District Court denied Odeh's motion to suppress the statements he made in Kenya.

Addressing Odeh's motion to suppress the statements he made to Pakistani officials while detained in Karachi, the District Court denied it as untimely. *Id.* While recognizing that it had "never imposed a hard deadline by which Odeh was required to renew his withdrawn June 20, 2000 suppression motion," the District Court observed that, pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, such motions must be raised "prior to trial" and "the unique context of this case necessitates that the 'prior to trial' . . . be interpreted as 'prior to jury selection.'" *Id.* By the time Odeh renewed this portion of his motion, the District Court had already spent nine days selecting a jury for the trial. *Id.* Had the District Court held a suppression hearing on Odeh's motion, "such action would certainly have resulted in great inconvenience to the 65 potential jurors the [District] Court had already selected and the 270 others who had yet to be subjected to individual voir dire" because their lives would be held in "abeyance" pending resolution of the suppression motion. *Id.* at 213-14. It would also have risked causing the District Court to cancel jury selection—the scope of which was the largest ever in the history of the Southern District of New York—and to begin the complicated process again after the conclusion of the suppression proceedings. *Id.* at 214. In addition, the District Court recognized the prejudice that holding a suppression hearing at the eleventh hour would cause the government, insofar as "any ruling in favor of suppression would have left the [g]overnment with insufficient time to alter its theory of the case in this sprawling prosecution." *Id.* Accordingly, the District Court deemed Odeh's motion untimely, and because Odeh offered "no valid reasons for his late submission," declined to disregard the untimeliness of the motion. *Id.* On this basis, as reinforced by the government's representation that it did not intend to use in its case-in-chief any of Odeh's statements obtained by

21

Pakistani authorities,[10] the District Court denied Odeh's motion to suppress the statements he made while in Pakistani custody. *Id.* at 215.

## II.    DISCUSSION

### A.    Odeh's and Al-'Owhali's Challenges to the District Court's Procedural Decisions

Odeh and Al-'Owhali challenge two procedural decisions of the District Court relating to their suppression motions, specifically the District Court's decisions: (1) permitting Odeh to withdraw his first suppression motion and (2) granting the government's motion to reopen Al-'Owhali's suppression hearing. We see no error in the District Court's rulings on these issues, nor do we perceive any merit in Odeh's argument that he received ineffective assistance of counsel when pressing these motions.

#### 1.    Odeh's Withdrawal of His First Motion to Suppress

Odeh faults both the District Court for ruling that his first motion to suppress had been withdrawn and his attorneys for not renewing the motion promptly thereafter. He claims that the decisions of the District Court and his attorneys violated his Fifth and Sixth Amendment rights. Odeh's position lacks merit. Odeh's own actions—in particular, his request, on religious grounds, to withdraw his affidavit in support of the suppression motion and his insistence, again on religious grounds, that his lawyers not re-file the motion—fully explain why his first suppression motion was deemed withdrawn by the District Court and not immediately renewed by his attorneys. Accordingly, he has no basis to complain now that his constitutional rights were violated.

As described above, Odeh's attorneys filed a motion to suppress on June 20, 2000 that was supported by an affidavit executed by Odeh. *See* Part I.B, *ante*. Shortly thereafter, Odeh contacted the District Court and the government to express his reservations about the motion. *Id.* Odeh's defense team also wrote to the District Court, requesting that Odeh be allowed to withdraw his affidavit and that

---

[10] As Odeh recognizes, these statements made to the Pakistani authorities were not used in the government's case-in-chief.

the District Court hold a hearing to determine whether Odeh's constitutional rights were adequately protected. In light of these letters, the District Court held a sealed, *ex parte* hearing (in the absence of representatives of the government) on August 1, 2000, at which Odeh, through the assistance of an interpreter, stated that, because of religious law, he wished to withdraw his affidavit and did not want his attorneys to continue to press the suppression motion on the basis of his testimony. The District Court inquired whether Odeh would permit his attorneys to resubmit the motion based on evidence other than his testimony. After consulting with Odeh, defense counsel intimated that Odeh might be willing to permit the filing of such a motion but expected his lawyers to first obtain his permission before making any such filing. Accordingly, the District Court acceded to Odeh's desire to withdraw his affidavit and, because the affidavit formed the basis for the suppression motion, deemed the motion withdrawn.

One member of Odeh's defense team objected to the District Court's ruling, and the District Court responded that its decision was without prejudice to re-filing the motion based on other evidence. The dissenting defense attorney persisted in her objection, arguing that the decision whether to submit or withdraw Odeh's affidavit was subject only to defense counsel's strategic judgment. Noting that this assertion was contrary to defense counsel's letter and made for the first time nearly an hour and thirty minutes into the hearing, the District Court did not alter its ruling but permitted counsel to brief the issue for the District Court's further consideration. Three months passed without any further submission from defense counsel. On September 28, 2000, the District Court raised the issue in the course of a proceeding on the withdrawal application of one of Odeh's counsel, explaining that it "ha[d] *not* ruled that no motion to suppress may be made absent Mr. Odeh's approval or affidavit but rather . . . explicitly deferred resolution of that matter, awaiting a further submission which [one of Odeh's attorneys] . . . advises the Court apparently will not be forthcoming." Appellants' App. 2775. The

23

suppression application was ultimately renewed by two motions filed on January 10 and January 18, 2001, both supported by an affidavit of Odeh.

Odeh contends that the District Court violated his Sixth Amendment right to the effective assistance of counsel by honoring his—that is, Odeh's—request to withdraw his affidavit and suppression motion despite his counsel's objection. This contention is entirely without merit. The Supreme Court has explained that a court "violates [a defendant's] right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The record shows no evidence—and Odeh has pointed to none—that the District Court interfered with the independent decisions of Odeh's defense team with respect to this motion. Instead, the record shows that on the independent applications of both Odeh and Odeh's attorneys, the District Court permitted the withdrawal of Odeh's affidavit because its submission allegedly conflicted with Odeh's religious beliefs. The District Court also held an *ex parte* hearing, at the request of Odeh's attorneys, to evaluate the circumstances underlying Odeh's decision. At this hearing, the District Court held that because Odeh wished to withdraw his affidavit and the suppression motion was dependent upon that affidavit, the motion would also be deemed withdrawn. As the District Court explained, Odeh could not "have it both ways"—by withdrawing the affidavit but continuing to press a motion raising claims supported almost entirely by that affidavit. Appellants' App. 2758. The District Court nevertheless permitted defense counsel to file "a new motion without an affidavit from the defendant," stating that the District Court "would defer decision on the adequacy of such a motion until after the [g]overnment had an opportunity to respond." *Id.* at 2774. When one member of Odeh's defense team challenged the ruling on the ground that the decision to withdraw an affidavit should be made by counsel and not the

24

defendant,[11] the District Court instructed her to brief the issue. She declined to do so. These rulings cannot constitute "interfere[nce] . . . with the ability of counsel to make independent decisions about how to conduct the defense," *Strickland*, 466 U.S. at 686.

Nor did the District Court interfere in any way with the independence of Odeh's defense team by noting in its August 1, 2000 Order that one of the defense attorneys had assured "Odeh with respect to this subject matter [that] nothing will be submitted to the Court that does not have his express approval." Appellant's App. 2764. Another member of the defense team construed this language as "instructing defense counsel not to file any motions without Mr. Odeh's express approval." *Id.* at 2769. The District Court corrected this misapprehension promptly, explaining: "the Court has not issued a broad pronouncement that a client's wishes as to all matters must prevail . . . [and] that no motion to suppress may be made absent Mr. Odeh's approval." *Id.* at 2775. Accordingly, the District Court's August 1 Order cannot be read to interfere with defense counsel's independent judgment.

In essence, the requests made by Odeh and his defense team required the District Court to mediate between Odeh's "right to control the presentation of his defense," *Lainfiesta v. Artuz*, 253 F.3d 151, 154 (2d Cir. 2001), and his right to the effective assistance of counsel. *Cf. Faretta v. California*, 422 U.S. 806, 820 (1975) ("The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally."). Recognizing Odeh's absolute control over the decision to testify, *see Brown v. Artuz*, 124 F.3d 73, 78 (2d Cir. 1997), and defense counsel's belief that a suppression motion was nevertheless warranted, we find no fault with the District Court's decision to (1) deem withdrawn the suppression

---

[11]*But see Dean v. Clinton Correctional Facility*, 93 F.3d 58, 61 (2d Cir. 1996) ("It clearly is preferable for counsel to leave the decision whether or not to reject a legal defense to the client. 'The lawyer should always remember that the decision whether to forego legally available objectives or methods because of non-legal factors is ultimately for the client and not for himself.'" (quoting Model Code of Professional Responsibility EC 7-8 (1983))).

motion that was based principally on Odeh's affidavit and (2) permit the motion's renewal if supported by evidence other than Odeh's affidavit. In so doing, the District Court admirably balanced Odeh's right to control his defense and his right to the effective assistance of counsel.

Asserting that "there is ample blame to be shared," Odeh Br. 63, Odeh now also faults his defense team at trial for (1) improperly deferring to his wishes to withdraw his affidavit in support of the motion to suppress, (2) failing to respond to the District Court's invitation for additional briefing on the withdrawal of the motion to suppress, and (3) neglecting, until the eve of trial, to re-file the suppression motion based on evidence other than his affidavit. Odeh's first two arguments are foreclosed by our determination in *United States v. Wellington* that "to the extent that defendant instructed his counsel to pursue a course of action that defendant now complains of, there was no abridgement—constructive or otherwise—of defendant's Sixth Amendment right to effective assistance of counsel." 417 F.3d 284, 289 (2d Cir. 2005). Deferring to the wishes of a client does not constitute ineffective assistance of counsel. With respect to Odeh's third argument, defense counsel's delay in re-filing the suppression motion was not prejudicial because the government represented that no statement from the interrogation conducted in Pakistan would be used at trial—and none of his statements was so used by the government. Because Odeh was not prejudiced by the delayed filing of the suppression motion, he cannot demonstrate ineffective assistance of counsel on that basis.

2.      The District Court's Reopening of Al-'Owhali's Suppression Hearing

Al-'Owhali argues that the District Court abused its discretion when, after granting his suppression motion, it then permitted the government to reopen the record in support of its motion for reconsideration. Relying on precedents from other circuits, Al-'Owhali faults the District Court's decision to reopen the suppression hearing without requiring the government to offer a reasonable justification for not having presented this evidence at the earlier proceeding. *See, e.g.*, *United States v.*

*Kithcart*, 218 F.3d 213, 220 (3d Cir. 2000) ("In order to properly exercise its discretion [to reopen suppression hearings] the district court must evaluate [the government's] explanation and determine if it is both reasonable, and adequate to explain why the government initially failed to introduce evidence that may have been essential to meeting its burden of proof."). By reopening the suppression hearing and permitting the government to present additional evidence, the District Court afforded the government, in Al-'Owhali's view, "the proverbial second bite of the apple."[12]

Because of the substantial "deference properly accorded a district court's decisions regarding evidentiary matters and the general conduct of trials," we review a district court's decision to reconsider an evidentiary ruling for abuse of discretion. *United States v. Bayless*, 201 F.3d 116, 131 (2d Cir. 2000). In *Bayless*, we neither endorsed nor rejected the position urged by Al-'Owhali—that when the government seeks to introduce new evidence in reopened suppression proceedings, the government must offer a reasonable justification for its failure to present the evidence earlier. *See id.* We observed, however, that "[o]ther courts, citing a policy in favor of introduction of lawfully obtained evidence, have declined to impose such a justification requirement." *Id.* In addition, we reiterated our view that "vague notions of unfairness, that the government should not have 'two bites' off the same apple, ought not [to] control." *Id.* at 132 (quoting *United States v. Tucker*, 380 F.2d 206, 214 (2d Cir. 1967)).

As presaged by our earlier cases, we now hold that, on a motion to reopen a suppression hearing, there is no bright-line rule that necessarily and invariably requires the government to provide a reasonable justification for its failure to offer relevant evidence at an earlier suppression proceeding. Whether or not the government can justify its delay is simply one factor, among others, that a district court may consider when deciding whether to reopen a suppression hearing. We agree with the other

---

[12] We note that, unlike Odeh's renewed motion to suppress (which was also filed after jury selection had begun, but five months after the initial motion was deemed withdrawn), the government's motion for reconsideration was promptly filed one week after the District Court's ruling.

circuits that have reached this conclusion.  A "defendant is entitled to have evidence suppressed only if it was obtained unconstitutionally.  If matters appearing later indicate that no constitutional violation occurred, society's interest in admitting all relevant evidence militates strongly in favor of permitting reconsideration."  *United States v. Regilio*, 669 F.2d 1169, 1177 (7th Cir. 1981).  As the Ninth Circuit has recognized, "[a] criminal defendant acquires no personal right of redress in suppressed evidence" because the rationale for suppressing unlawfully obtained evidence is to deter official misconduct, not to compensate criminal defendants for the violation.  *United States v. Rabb*, 752 F.2d 1320, 1323 (9th Cir. 1984).  If the government possesses evidence showing that, in fact, no official misconduct occurred, the interests of justice militate strongly in favor of considering this evidence even if it is belatedly brought to the district court's attention.  In the last analysis, a district court should be permitted, in the exercise of its discretion and in light of the totality of the circumstances, to determine whether its suppression ruling should stand.  While it may often be useful for the government to explain its reasons for not introducing evidence earlier, a district court may consider the evidence without first finding good cause for the government's omission or delay.

The case now before us illustrates the wisdom of consigning the decision to reopen evidentiary hearings to the sound discretion of the district court, unencumbered by bright-line rules.  Here, the District Court recognized that its decision to grant Al-'Owhali's suppression motion was based on "certain factual assumptions which [subsequently] appear[ed] to be inaccurate" in light of the evidence submitted in support of the government's motion to reopen the suppression hearing.  Supplemental App. 1119.  In addition, the legal question—namely, the application of the Fifth Amendment and *Miranda* to statements taken overseas—was one "of first impression not only in this circuit but nationally."  *Id.*  That the District Court chose to reopen the record in light of the government's additional evidence and the significance of the legal question at issue strikes us as an eminently

28

reasonable course of action. In addition, the courts that have imposed a rule requiring the government to show good cause to reopen evidentiary hearings appear to have done so because "from the beginning [of the proceedings] the government was fully aware of what it had to establish to successfully oppose [the defendant's] suppression motion." *Kithcart*, 218 F.3d at 220. The suppression motion before the District Court in the instant case—involving the applicability of the Fifth Amendment and *Miranda* to overseas investigations—was, as noted, "of first impression" and, accordingly, the government cannot be said to have been aware "from the beginning . . . of what it had to establish."[13]

Even if we were to impose a "justification" requirement, the government surely met it here. In its motion, the government offered at least two justifications for not having introduced certain evidence at the initial suppression hearing. First, the government pointed to the shortened time frame for the suppression hearing associated with Al-'Owhali's delay in filing his motion[14] which "necessitated an expedited hearing during the midst of jury selection and final trial preparations," Al-'Owhali App. 1207. The result of this schedule, according to the government, was that it "misperceived the disputed issues that most troubled the [District] Court" and, therefore, did not initially present evidence most relevant to the Court's concerns. *Id.* Second, the government did not submit certain evidence at the initial suppression hearing out of concern, raised by Al-'Owhali's own counsel, that news accounts of the hearing might taint the jury pool. *Id.* at 1211. It planned to offer those statements under seal in the

---

[13] Indeed, Al-'Owhali's criticism of the government for offering a different basis for admitting his statements in response to the District Court's ruling only reinforces the novelty of the legal questions raised by his motion and, perhaps unwittingly, underscores the advisability of affording the District Court wide latitude to ensure that its decision—announcing for the first time a framework for resolving suppression motions involving overseas interrogation by U.S. agents—took account of all the relevant facts.

[14] The District Court agreed with the government on this point: "The lateness of Al-'Owhali's motion was due to various circumstances that included a change of counsel for Al-'Owhali and his ambivalence as to whether the motion should even be made." *Bin Laden*, 132 F. Supp. 2d at 172; *see also United States v. Bin Laden*, No. 98 Cr. 1023, 2001 WL 1160604, at *9 (S.D.N.Y. Oct. 2, 2001) ("It must also be emphasized that the time pressures which were present throughout the suppression proceedings (which took place during an interruption in jury selection) were entirely the result of Al-'Owhali's extended procrastination with respect to the filing of the motion. It hardly behooves him to complain about timing.").

reopened suppression hearing. Either of these explanations would have been sufficient justification, in our view, to warrant reopening the suppression hearings.

Accordingly, we reject Al-'Owhali's challenge to the District Court's decision to reopen the suppression hearing.

**B.      Al-'Owhali's and Odeh's Challenges to the Denial of their Motions to Suppress Inculpatory Statements**

1.      Standard of Review

When a defendant challenges the denial of a suppression motion, we review the district court's factual findings for clear error, viewing the evidence in the light most favorable to the government. *See, e.g.*, *United States v. Yousef*, 327 F.3d 56, 124 (2d Cir. 2003). Our review of the district court's legal conclusions is *de novo. Id.*

2.      The Applicability of the Fifth Amendment and *Miranda* to the Admission at Trial of Inculpatory Statements Made in Foreign Custody to U.S. Agents

Like the District Court, we conclude that the admissibility at trial of statements made to U.S. agents by foreign nationals held in foreign custody is governed by the Fifth Amendment. Indeed, the government does not argue otherwise. Although we need not decide whether we agree with the District Court as to all aspects of its ruling on the Fifth Amendment and *Miranda*, it suffices to hold, as described in greater detail below, that insofar as *Miranda* might apply to interrogations conducted overseas, that decision is satisfied when a U.S. agent informs a foreign detainee of his rights under the U.S. Constitution when questioned overseas.

We note that U.S. agents acting overseas need not become experts in foreign criminal procedure in order to comply with *Miranda*; nor need they advocate for the appointment of local counsel on a foreign suspect's behalf. While doing so may provide additional grounds for finding that any statements obtained in the course of interrogations were made voluntarily, it is not required by either the Fifth

30

Amendment or *Miranda*. If the suspect chooses to make a knowing and voluntary waiver of his rights after a warning adapted to the circumstances of questioning overseas and chooses to speak with a U.S. agent, then neither the Fifth Amendment nor *Miranda* will bar the admission of his statement at trial.

a. The Fifth Amendment Right Against Self-Incrimination in Domestic Trials

We note at the outset that our analysis of the applicability of the Fifth Amendment to this prosecution differs from our analysis of the Fourth Amendment's applicability. *See In re Terrorist Bombings of U.S. Embassies in East Africa (Fourth Amendment Challenges)*, __ F.3d __ (2d Cir. 2008). While a violation of the Fourth Amendment's prohibition of unreasonable searches and seizures occurs at the time of the search or seizure, regardless of whether unlawfully obtained evidence is ever offered at trial, a violation of the Fifth Amendment's right against self-incrimination occurs only when a compelled statement is offered at trial against the defendant. In *United States v. Verdugo-Urquidez*, the Supreme Court explained that "[t]he privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial." 494 U.S. at 264 (citing *Malloy v. Hogan*, 378 U.S. 1 (1964); *Kastigar v. United States*, 406 U.S. 441, 453 (1972)). The Fourth Amendment "functions differently"; it is violated "at the time of an unreasonable governmental intrusion." *Id.* (citing *United States v. Calandra*, 414 U.S. 338, 354 (1974); *United States v. Leon*, 468 U.S. 897, 906 (1984)). Accordingly, the Fourth Amendment's prohibition of unreasonable searches and seizures regulates the activities of the government when investigating crimes, while the Fifth Amendment's privilege against self-incrimination regulates the admissibility of a defendant's statements at trial.

Because a putative violation of the Fourth Amendment is "fully accomplished" at the place and time of the alleged intrusion, *id.*, a claimed violation occurring overseas entails an analysis of the extraterritorial application of the Fourth Amendment. No such analysis is necessary with respect to the

31

Fifth Amendment's privilege against self-incrimination because that provision governs the admissibility of evidence at U.S. trials, not the conduct of U.S. agents investigating criminal activity. For this reason, it naturally follows that, regardless of the origin—*i.e.*, domestic or foreign—of a statement, it cannot be admitted at trial in the United States if the statement was "compelled." U.S. Const. amend. V. Similarly, it does not matter whether the defendant is a U.S. citizen or a foreign national: "no person" tried in the civilian courts of the United States can be compelled "to be a witness against himself." *Id.*

While the Supreme Court has not been called upon to state this latter principle explicitly,[15] it has held that the Fifth Amendment's right to due process of law applies equally to U.S. citizens and foreign nationals present in the United States, even those here unlawfully.[16] *See Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons [*i.e.*, non-citizens] from deprivation of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection." (internal citations omitted)). We see no basis to consign the "fundamental trial right" of a defendant to be free of compelled self-incrimination, *Verdugo-Urquidez*, 494 U.S. at 264, to lesser status. Indeed, the principles animating the privilege against self-incrimination apply with equal force to both citizens and foreigners who are haled into our courts to answer criminal charges. As described by the Supreme Court:

---

[15] This may be so because, as here, the government has previously taken the position that it does not dispute the applicability of the self-incrimination clause to non-U.S. citizens. *See, e.g.*, *United States v. Rommy*, 506 F.3d 108, 131 (2d Cir. 2007) ("[W]e observe that neither in the district court nor on this appeal do the parties dispute the applicability of Fifth and Sixth Amendment protections to the custodial interrogation of a foreign national outside the United States by agents of this country engaged in a criminal investigation.").

[16] The Supreme Court has held that resident aliens are protected by the Fifth Amendment's privilege against self-incrimination. *See United States v. Balsys*, 524 U.S. 666, 671 (1998) ("Resident aliens . . . are considered 'persons' for purposes of the Fifth Amendment and are entitled to the same protections under the [Self-Incrimination] Clause as citizens.").

32

"[The privilege against self-incrimination] reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load; our respect for the inviolability of the human personality and of the right of each individual to a private enclave where he may lead a private life[;] our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes a shelter to the guilty, is often a protection to the innocent."

*United States v. Balsys*, 524 U.S. 666, 690 (1998) (quoting *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 55 (1964)).  For these reasons, we have previously required that, in order to be admitted in our courts, inculpatory statements obtained overseas by foreign officials must have been made voluntarily.  *See Yousef*, 327 F.3d at 145 ("[S]tatements taken by foreign police in the absence of *Miranda* warnings are admissible if voluntary.").

We do not read the Supreme Court's holding in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), as evidence to the contrary.  In *Eisentrager*, twenty-one Germans convicted of war crimes by a U.S. military court located in China petitioned the U.S. District Court for the District of Columbia for a writ of habeas corpus because, *inter alia*, their trials entailed the use of testimony allegedly compelled in violation of the Fifth Amendment.  At the outset, the Court emphasized the "inherent distinctions recognized throughout the civilized world between . . . resident enemy aliens who have submitted themselves to our laws and nonresident enemy aliens who at all times have remained with, and adhered to, enemy governments."  *Id.* at 769.  With respect to extending constitutional protections to aliens within the borders of the United States, the Court explained "the alien's presence within its territorial jurisdiction . . . gave the Judiciary power to act."  *Id.* at 771.  The petitioners in *Eisentrager*, however, were not within the territorial jurisdiction of the United States; they were captured and tried in China and imprisoned in Germany.  The Court explained that "the nonresident enemy alien, especially one who has remained in

33

the service of the enemy, does not have even th[e] qualified access [of a resident enemy alien] to our courts, for he neither has comparable claims upon our institutions nor could his use of them fail to be helpful to the enemy." *Id.* at 776. Most significantly, the Court viewed the availability of habeas corpus to non-resident enemy aliens as a mechanism for undermining American military efforts. *Id.* at 779.[17] Part and parcel of waging war, the Court observed, is "[t]he jurisdiction of military authorities, during or following hostilities, to punish those guilty of offenses against the laws of war." *Id.* at 786. For these reasons, the Court's rejection of the Fifth Amendment claim in *Eisentrager* cannot be unmoored from the salient facts of the case: an overseas conviction of "nonresident enemy aliens," following the cessation of hostilities, by a duly-constituted military court. *Cf. Boumediene v. Bush*, 553 U.S. __, 128 S. Ct. 2229, 2261 (2008) (explaining that "at the time *Eisentrager* was decided, the Court was right to be concerned about judicial interference with the military's efforts to contain enemy elements, guerilla fighters, and 'were-wolves'" in light of the " historical context and nature of the military's mission in post-War Germany" (internal quotation marks omitted)). The *Eisentrager* holding is inapposite, therefore, to the facts before us: a domestic prosecution of nonresident aliens brought to this country specifically to be prosecuted by our civilian criminal courts.

Accordingly, we hold that foreign nationals interrogated overseas but tried in the civilian courts of the United States are protected by the Fifth Amendment's self-incrimination clause.

---

[17] On the availability of the writ of habeas corpus to non-resident enemy aliens, the Court reasoned:

> The writ, since it is held to be a matter of right, would be equally available to enemies during active hostilities as in the present twilight between war and peace. Such trials would hamper the war effort and bring aid and comfort to the enemy. They would diminish the prestige of our commanders, not only with enemies but with wavering neutrals. It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home. Nor is it unlikely that the result of such enemy litigiousness would be a conflict between judicial and military opinion highly comforting to enemies of the United States.

*Id.* at 779.

b.     The Application of *Miranda* to U.S. Interrogations Conducted Overseas

Having determined that the Fifth Amendment right against self-incrimination governs the

admissibility at trial of statements made overseas, we turn to the related question of *Miranda*'s

applicability to overseas interrogations conducted by U.S. agents.  The Supreme Court has not ruled on

this particular question, but it has held that the framework established by "*Miranda . . .* govern[s] the

admissibility of statements made during custodial interrogation in both state and federal courts."

*Dickerson v. United States*, 530 U.S. 428, 432 (2000).  Proceeding on the assumption that the *Miranda*

framework generally governs the admissibility of statements obtained overseas by U.S. agents, we

conclude that the application of that framework to overseas interrogations may differ from its domestic

application, depending on local circumstances, in keeping with the context-specific nature of the *Miranda*

rule.

In *Dickerson*, the Supreme Court explained that the *Miranda* "warning/waiver" framework arose

from the risk "that the coercion inherent in custodial interrogation blurs the line between voluntary and

involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege

under the Fifth Amendment . . . not to be compelled to incriminate himself.'"  530 U.S. at 435 (quoting

*Miranda*, 384 U.S. at 439) (alterations in original).  In response, the Court set forth "constitutional

guidelines" conditioning the admissibility of statements obtained in custodial interrogations on whether

a suspect had been warned that he:

> "has the right to remain silent, that anything he says can be used against him in a court of law,
> that he has the right to the presence of an attorney, and that if he cannot afford an attorney one
> will be appointed for him prior to any questioning if he so desires."

*Id.* (quoting *Miranda*, 384 U.S. at 479).  Undergirding these guidelines are two objectives:

"trustworthiness and deterrence."  *Oregon v. Elstad*, 470 U.S. 298, 308 (1985).  By "adequately and

effectively appris[ing] [a suspect] of his rights" and reassuring the suspect that "the exercise of those

rights must be fully honored," the *Miranda* warnings "combat the[ ] pressures" inherent in custodial interrogations. *Miranda*, 384 U.S. at 467. In so doing, they enhance the trustworthiness of any statements that may be elicited during an interrogation. With respect to deterrence, the Court has explained that, "[b]y refusing to admit evidence gained as a result of [willful or negligent] conduct [depriving the defendant of a right], the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused." *Michigan v. Tucker*, 417 U.S. 433, 447 (1974). Thus, courts suppress un-warned statements, even those that may otherwise be voluntary and trustworthy, in order to deter future misconduct by law enforcement agents.

Recognizing that the threat of suppression in U.S. courts for failure to comply with *Miranda* holds little sway over foreign authorities, we have declined to suppress un-warned statements obtained overseas by foreign officials. In *United States v. Welch*, we recognized, in line with the approach of the Ninth Circuit, that "the *Miranda* requirements were primarily designed to prevent United States police officers from relying upon improper interrogation techniques and as the requirements have little, if any, deterrent effect upon foreign police officers, the *Miranda* warnings should not serve as the *sine qua non* of admissibility." 455 F.2d 211, 213 (2d Cir. 1972) (citing *United States v. Chavarria*, 443 F.2d 904, 905 (9th Cir. 1971)); *see also United States v. Martindale*, 790 F.2d 1129, 1131 (4th Cir. 1986) ("There was no requirement on the part of the British officers of compliance with the rule either in [*Miranda*], or in *Massiah v. United States*, 377 U.S. 201 (1964)."); *United States v. Nolan*, 551 F.2d 266, 273 (10th Cir. 1977) (adopting similar reasoning); *Kilday v. United States*, 481 F.2d 655, 656 (5th Cir. 1973) ("[T]he United States Constitution cannot compel such specific, affirmative action [*i.e.*, providing *Miranda* warnings] by foreign sovereigns, so the policy of deterring so-called 'third degree' police tactics, which underlies the *Miranda* exclusionary rule, is inapposite to this case."); *Chavarria*, 443 F.2d at 905 ("When the interrogation is by the authorities of a foreign jurisdiction, the exclusionary rule has little or no effect

36

upon the conduct of foreign police."). Instead of applying *Miranda* in such cases, we have required that "[w]henever a court is asked to rule upon the admissibility of a statement made to a foreign police officer, the court must consider the totality of the circumstances to determine whether the statement was voluntary. If the court finds the statement involuntary, it must exclude this because of its inherent unreliability." *Welch*, 455 F.2d at 213.

When U.S. law enforcement agents or officials are involved in overseas interrogation, however, the deterrence rationale retains its force. In such circumstances, the twin goals of ensuring trustworthiness and deterring misconduct might compel the application of *Miranda*. We suggested as much in *Yousef*, 327 F.3d at 56. In *Yousef*, we observed that "statements taken by foreign police in the absence of *Miranda* warnings are admissible if voluntary," subject to two exceptions. *Id.* at 145. One of these exceptions—the so-called "joint venture doctrine"—appears to have been "implicitly adopted" by our Court, even though we have "failed to define its precise contours." *Id.* at 146.[18] Pursuant to this exception, "statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings must be suppressed whenever United States law enforcement agents actively participate in questioning conducted by foreign authorities." *Id.* at 145. Other circuits have explicitly recognized the applicability of *Miranda* to custodial statements elicited overseas through the active participation of U.S. agents. *See United States v. Heller*, 625 F.2d 594, 599 (5th Cir. 1980) ("[I]f American officials participated in the foreign search or interrogation, or if the foreign authorities were acting as agents for their American counterparts, the exclusionary rule should be invoked."); *Pfeifer v. U.S. Bureau of Prisons*, 615 F.2d 873, 877 (9th Cir. 1980) ("Under the joint venture doctrine, evidence obtained through activities of foreign officials, in which federal agents substantially participated and which violated the accused's Fifth Amendment or *Miranda* rights, must be suppressed in a subsequent trial in the United States."). In light

---

[18] The other exception noted by the *Yousef* Court pertains to "statements obtained under circumstances that 'shock the judicial conscience.'" 327 F.3d at 146.

of these precedents, we proceed on the assumption that the *Miranda* "warning/waiver" framework generally governs the admissibility in our domestic courts of custodial statements obtained by U.S. officials from individuals during their detention under the authority of foreign governments.[19]

Even if we were to conclude, rather than assume, that *Miranda* applies to overseas interrogations involving U.S. agents, that would not mean that U.S. agents must recite verbatim the familiar *Miranda* warnings to those detained in foreign lands. As the Supreme Court explained in *Duckworth v. Eagan*, the "*Miranda* warnings [need not] be given in the exact form described in that decision." 492 U.S. 195, 202 (1989). In fact, the Supreme Court decried a reviewing court's "rigidity . . . [in requiring a] precise formulation of the warnings given a criminal defendant" in *California v. Prysock*, holding that "no talismanic incantation [i]s required to satisfy [*Miranda*'s] strictures." 453 U.S. 355, 359 (1981); *see also Dickerson*, 530 U.S. at 440 n.6 ("[T]he Constitution does not require police to administer the particular *Miranda* warnings."). Indeed, the *Miranda* Court itself stated that its "decision in no way creates a constitutional straitjacket" and that "other procedures which are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it" could pass constitutional muster. *Miranda*, 384 U.S. at 467. The *Dickerson* Court observed that "no constitutional rule is immutable," 530 U.S. at 441, citing exceptions to the *Miranda* rule—such as the "public safety" exception, *see New York v. Quarles*, 467 U.S. 649, 657 (1984) (concluding that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the [*Miranda*] rule protecting the Fifth Amendment's privilege against self-incrimination"), and the exception for prior inconsistent statements, *see Harris v. New York*, 401 U.S. 222, 226 (1971) (holding that "[t]he shield

---

[19] Our recognition that *Miranda* might apply to foreign detainees held overseas should in no way impair the ability of the U.S. government to gather foreign intelligence. First, *Miranda*'s "public safety" exception, *see New York v. Quarles*, 467 U.S. 649 (1984), would likely apply overseas with no less force than it does domestically. When exigent circumstances compel an un-warned interrogation in order to protect the public, *Miranda* would not impair the government's ability to obtain that information. Second, we emphasize that the *Miranda* framework governs only the admission of custodial statements at U.S. trials. Insofar as U.S. agents do not seek to introduce statements obtained through overseas custodial interrogations at U.S. trials, *Miranda*'s strictures would not apply.

provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances"). The Court explained: "No court laying down a general rule can possibly foresee the various circumstances in which counsel will seek to apply it, and the sort of modifications represented by these cases are as much a normal part of constitutional law as the original decision." *Dickerson*, 530 U.S. at 441.

The federal appellate decisions applying *Miranda*'s "warning/waiver" framework to overseas interrogations demonstrate the flexibility and adaptability of the rule. In *Cranford v. Rodriguez*, 512 F.2d 860 (10th Cir. 1975), the Tenth Circuit considered a challenge to a waiver form brought by a defendant initially detained in Mexico by Mexican authorities and subsequently questioned there by U.S. agents. After rejecting the argument that *Miranda* did not apply outside the United States, *id.* at 863, the Tenth Circuit considered the sufficiency of a standard waiver form modified to omit "the line respecting appointment of a lawyer and inserting instead that if [the suspect] wished to consult the American Consulate the latter would be advised of his detention and '[the suspect] will be given the opportunity to talk to a Consulate representative,'" *id.* at 862. The Tenth Circuit considered this "variation" of the standard *Miranda* warnings to be "unavoidable [due to the lack of availability of a U.S. lawyer in Mexico] and not prejudicial." *Id.* at 863. It stated that "[t]he petitioner was admonished that he need not speak; that he was [informed that he was] entitled to talk to a Consulate official; that anything he said could be used against him in court; and that if he decided to answer questions without a lawyer he could stop at any time." *Id.* The Tenth Circuit held that this "good faith effort" to inform a suspect of his rights complied with the *Miranda* framework. *Id.*

The Fifth Circuit reached a similar conclusion in *United States v. Dopf*, a case considering the admissibility of statements obtained in a custodial interview held in Mexico by a U.S. agent in light of a warning that omitted reference to the appointment of counsel. 434 F.2d 205 (5th Cir. 1970).

39

Specifically, the U.S. agent warned the suspects that "anything they said could be used against them when and if they were returned to the United States; that he could not furnish them with a lawyer in Mexico but offered to contact the American Consul on their behalf." *Id.* at 207. Even though the agent had neither informed the suspects of their right to appointed counsel nor obtained written waivers from them, the Fifth Circuit concluded:

> [The agent] did everything that he reasonably could have done to protect the rights of appellants by advising them of their right to remain silent, of the possible use against them of incriminatory statements, of the reason why they could not be furnished counsel by the U.S. Government while they were in Mexico and of the availability of the American Consul for their assistance.

*Id.*

As these decisions demonstrate, where *Miranda* has been applied to overseas interrogations by U.S. agents, it has been so applied in a flexible fashion to accommodate the exigencies of local conditions. This context-specific approach is wholly consistent with our reading of the Supreme Court decisions construing the *Miranda* framework, and we now apply that approach to the facts of this case.[20]

3.       Application of the Fifth Amendment and *Miranda* to Defendants' Statements

a.      The AOR

Turning first to the AOR, we observe that it provided five notices to Al-'Owhali and Odeh. It warned them that under U.S. law: (1) they had the right to remain silent; (2) if they chose to speak, anything they said could be used against them in court; (3) in the United States, they would have had the right to consult with a lawyer and to have a lawyer present during questioning; (4) in the United States, a lawyer would have been appointed for them if they could not afford one; and (5) if they chose not to speak, that fact could not be used against them in a U.S. court. *See* Part I.A, *ante*. It further advised them that "[b]ecause we are not in the United States, we cannot ensure that you will have a lawyer

---

[20] Because we conclude that, assuming they apply, the strictures of *Miranda* were satisfied in this case, *see* Part II.B.3, *post*, we leave for another day the question of whether the *Miranda* "warning/waiver" framework governs the admissibility of statements obtained in the course of custodial interrogations conducted overseas.

40

appointed for you before any questioning." *Id.* The District Court held that the AOR ran afoul of *Miranda* because it suggested that defendants lacked the right to the presence and appointment of counsel because they were held outside of the United States. We do not believe that the AOR was as deficient as the District Court believed it to be, but, as explained below, we also think that the advice as to the right to counsel could have been made clearer. In any event, we need not rule definitively on the adequacy of the AOR because we agree fully with the District Court that the subsequent oral advice fully complied with whatever *Miranda* requirements were applicable.

The AOR presented defendants with a factually accurate statement of their rights under the U.S. Constitution and how those rights might be limited by the governing non-U.S. criminal procedures. In addition, it advised defendants of a right normally not contained in *Miranda* warnings—that the defendants' silence could not be used against them at an American trial. This additional warning amplified the AOR's cautionary message and thus reinforces the warning's adequacy under *Miranda*.

Like the District Court, we consider the first two warnings in the AOR—the right to remain silent and the introduction at trial of any statements made thereafter—to be entirely consistent with the text and teaching of *Miranda*.

With respect to the rights to presence and appointment of counsel, however, we disagree with the District Court's conclusion that the AOR "wrongly convey[ed] to a suspect that, due to his custodial situs outside the United States, he currently possesse[d] no opportunity to avail himself of the services of an attorney before or during questioning by U.S. officials."[21] *Bin Laden*, 132 F. Supp. 2d at 190. The

---

[21] The relevant language in the AOR follows:

In the United States, you would have the right to talk to a lawyer to get advice before we ask you any questions and you could have a lawyer with you during questioning. In the United States, if you could not afford a lawyer, one would be appointed for you, if you wish, before any questioning.

Because we are not in the United States, we cannot ensure that you will have a lawyer appointed for you before any questioning.

AOR, in the District Court's view, "prematurely foreclose[d] the significant possibility that the foreign authorities themselves may, if asked, either supply counsel at public expense or permit retained counsel inside the stationhouse." *Id.* at 190. The District Court held that U.S. agents participating in overseas investigations must "[t]o the maximum extent reasonably possible, [make] efforts . . . to replicate what rights would be present if the interrogation were being conducted in America." *Id.* at 188. They must also "be clear and candid as to both the existence of the right to counsel and the possible impediments to its exercise." *Id.* To explain and illustrate its holding, the District Court suggested that an acceptable *Miranda* warning would include the offer to "ask the foreign authorities to permit access to a lawyer or to appoint one for [the suspect]." *Id.* at 189 n.16. Because the AOR read to Al-'Owhali and Odeh did not include such an offer, and because it suggested that "[t]he right to counsel . . . depend[ed] on geography, when instead it actually hinged on foreign law," the District Court held that the "AOR, on its face, [was] inadequate under *Miranda* and its progeny." *Id.* at 191-92.

In our view, the AOR presented defendants with a factually accurate statement of their right to counsel under the U.S. Constitution; it also explained that the effectuation of that right might be limited by the strictures of criminal procedure in a foreign land. We do not agree with the District Court's view that the relevant section of the AOR amounts to a suggestion that counsel is not available. The AOR informed defendants that "in the United States" they would be entitled to the presence and appointment of defense counsel, but because they were not in the United States, U.S. agents could not ensure that counsel would, in fact, be appointed. This is so because the law of Kenya, as the detaining authority—and not U.S. law—governed whether defendants were entitled to (a) the appointment of publicly financed counsel and (b) the presence of counsel during interrogations. In that sense, the right to counsel did indeed "depend on geography." In cases where a suspect has no entitlement to counsel

---

*Bin Laden*, 132 F. Supp. 2d at 173; *Bin Laden*, 132 F. Supp. 2d at 203.

42

under the law of the foreign land, it would be misleading to inform him falsely that he was guaranteed the presence or appointment of an attorney—and *Miranda* does not require the provision of false assurances.

The warning at issue here was candid:  It explained the rights provided by the U.S. Constitution, while recognizing that, because defendants were detained outside the United States, U.S. law did not govern the terms of their detention or interrogation.  Rather than indicating that defendants had no right to appointed counsel, the AOR stated that defendants may have to look to local law for the effectuation of those rights.  Indeed, the facts presented by Odeh's case bear this out.  Upon hearing the AOR's warnings, Odeh did not assume that counsel was unavailable; instead, he inquired whether counsel was available under Kenyan law.  *See* Part I.A.2, *ante*.  For these reasons, we do not equate the language of the AOR with a statement that counsel was unavailable.  Instead, we read that language as a candid acknowledgment of the possible disparity between rights established by the U.S. Constitution, on the one hand, and the availability of counsel and entitlement to the assistance of counsel under the law of the detaining authority, on the other.

The District Court compensated for this potential disparity between U.S. constitutional rights and the rights that obtain overseas by requiring U.S. agents to study local criminal procedure and urge local officials to provide suspects with counsel, if requested, so as to "replicate" the rights that they would have in the United States.  We do not agree that *Miranda* requires such efforts.

As the Supreme Court set forth in *Duckworth*, "*Miranda* does not require that attorneys be producible on call, but only that the suspect be *informed . . .* that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one." 492 U.S. at 204 (emphasis added).  The defendant in *Duckworth* received the following warning:

> You have the right to remain silent.  Anything you say can be used against you in court.  *You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during*

*questioning.* You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.* If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you've talked to a lawyer.

*Id.* at 198 (emphasis in original). This warning was challenged on the grounds that it failed to provide a "clear and unequivocal warning of the right to appointed counsel before any interrogation" and "link[ed] an indigent's right to counsel before interrogation with a future event." *Id.* at 200. The Supreme Court rejected the challenge, refusing to endorse a "rigid" application of *Miranda*. The Court held, in a case arising in a purely domestic setting, that government officials are permitted to "accurately describe[] the procedure for the appointment of counsel" under applicable law. *Id.* at 204. If, under those procedures, "the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel." *Id.* In other words, *Miranda* requires government agents to be the conduits of *information* to detained suspects—both as to (1) their rights under the U.S. Constitution to the presence and appointment of counsel at custodial interrogations and (2) the procedures through which they might be able to vindicate those rights under local law. It does not compel the police to serve as *advocates* for detainees before local authorities, endeavoring to expand the rights and privileges available under local law. This is not to say that if, after being informed of his *Miranda* rights, a detainee insists on the immediate appointment of counsel as a condition of making a statement, the U.S. officials are barred from attempting to expedite the provision of counsel. Quite the contrary; doing so is perfectly consistent with *Miranda*, but it is not required.

Because compliance with *Miranda* does not require law enforcement to advocate on behalf of suspects detained in the United States, we see no basis for adopting a different rule for detainees held overseas by foreign powers. It is true that the rights of foreign detainees to the presence and appointment of counsel will depend on foreign law, but, as noted above, *Miranda* does not require the

provision of legal services. It requires only that, until legal services are either provided or waived, no interrogation take place. At the request of foreign detainees or on their own initiative, U.S. agents are free to describe the procedures by which attorneys are made available in foreign countries, so long as they make an honest, good faith effort to provide accurate information. Foreign detainees may, of course, insist that they receive local counsel or U.S. counsel as a condition of making a statement. In response, U.S. agents may, in their discretion, appeal to local authorities to appoint counsel or even obtain U.S. counsel for them. Alternatively, foreign detainees may determine that, in light of the difficulty of obtaining or unavailability of counsel under local law, it is in their best interests to waive their right to counsel and make a statement to U.S. agents. We see nothing contrary to the spirit or letter of *Miranda*, particularly as construed in *Duckworth*, in either of these results.

We are aware that, as defendants urge, foreign detainees may run the risk of refusing to speak to U.S. officials only to find themselves forced to speak to their foreign jailors. This would be so, however, even if U.S. agents made efforts to secure counsel on their behalf and those efforts proved fruitless. The risk of being forced to speak to their foreign jailor would also exist, moreover, if U.S. agents were not involved at all. Of course, statements obtained under these circumstances could not be admitted in a U.S. trial if the situation indicated that the statements were made involuntarily. *Yousef*, 327 F.3d 145.[22]

Our decision not to impose additional duties on U.S. agents operating overseas is animated, in part, by our recognition that it is only through the cooperation of local authorities that U.S. agents obtain access to foreign detainees. We have no desire to strain that spirit of cooperation by compelling U.S. agents to press foreign governments for the provision of legal rights not recognized by their criminal justice systems. "For better or for worse, we live in a world of nation-states in which our Government must be able to 'function effectively in the company of sovereign nations.' Some who

---

[22] As we discuss in Part II.B.3.c.ii, *post*, we are satisfied that the statements at issue here were given voluntarily.

violate our laws may live outside our borders under a regime quite different from that which obtains in this country." *Verdugo-Urquidez*, 494 U.S. at 275 (quoting *Perez v. Brownell*, 356 U.S. 44, 57 (1958)). The rule of *Miranda* does not require conscripting our agents to be legal advocates for foreign detainees thereby disrupting the delicate relations between our government and a foreign power.

Although we do not find the advice of rights concerning counsel as deficient as did the District Court, we think the wording that was used created a needless risk of misunderstanding by stating, albeit accurately, what the right to counsel would have been had the interrogation occurred in the United States. An advice of rights should state only what rights are available, not what rights would be available if circumstances were different. This does not mean that U.S. agents need to determine what rights are in fact available under local law. All they need to say is that counsel rights depend on local law, and that the U.S. agents will afford the accused whatever rights are available under local law. Thus, an AOR used hereafter might usefully advise as to counsel rights in the following language:

> Whether you can retain a lawyer, or have a lawyer appointed for you, and whether you can consult with a lawyer and have a lawyer present during questioning are matters that depend on local law, and we cannot advise you on such matters. If local authorities permit you to obtain counsel (retained or appointed) and to consult with a lawyer at this time, you may attempt to obtain and consult with an attorney before speaking with us. Similarly, if local authorities permit you to have a lawyer present during questioning by local authorities, your lawyer may attend any questioning by us.

For these reasons, we conclude that the AOR substantially complied with whatever *Miranda* requirements were applicable, but we need not rule definitively on the matter because of the adequacy of the subsequent oral warning, and because the error, if any, in excluding the statements obtained prior to the oral warning benefitted defendants and was therefore harmless.

b. The Oral Warning Provided by the AUSA Also Satisfied *Miranda*

With respect to the oral warnings provided by the AUSA, we see no basis to disturb the District Court's rulings that the AUSA administered the warnings and that these warnings were sufficient to apprise defendants of their *Miranda* rights.

Al-'Owhali argues that the District Court erroneously found that the AUSA administered the oral warnings based on the testimony of the AUSA. He contends that the AUSA simply fabricated his testimony and tailored it to conform with the legal standard announced by the District Court.[23] Accordingly, he maintains that the record makes "clear that the AOR warnings were the *only* warnings" that he received. Al-'Owhali Br. 91 (emphasis in original).

As noted above, we review a District Court's factual findings for clear error, viewing the facts in the light most favorable to the government. *See* Part II.B.1, *ante*. We have emphasized that "'credibility determinations are the province of the trial judge, and should not be overruled on appeal unless clearly erroneous.'" *Yousef*, 327 F.3d at 124 (quoting *United States v. Rosa*, 11 F.3d 315, 329 (2d Cir. 1993)). The District Court's credibility determination with respect to the AUSA's testimony is unambiguous:

> The suggestion that Assistant United States Attorney [ ] improperly altered his testimony as a consequence of the reopening to meet the Court's objections is belied by the fact that his affidavit, which discussed the advice of rights given Al-'Owhali, was submitted before the Court granted the motion to reopen. To the extent that any of Al-'Owhali's arguments in favor of suppression are predicated on challenges to the credibility of the [g]overnment's witnesses, they are unavailing.

---

[23] He contends that the Court should not have credited the AUSA's testimony at the reopened suppression hearing because the government had urged throughout the prior proceedings that *Miranda* did not apply overseas and the AUSA's testimony was inconsistent with that position. In support of this argument, Al-'Owhali points to the government's "longstanding position" before the District Court that "it did not provide a standard *Miranda* warning because none was required, and such a warning would have, in any event, seriously misrepresented Kenyan law." Al-'Owhali Br. 91. Al-'Owhali urges that, because the government was laboring under the belief that a conventional *Miranda* warning was unnecessary, it would have been inconsistent for one of the agents of the government—the AUSA—to provide such a warning. In addition, Al-'Owhali points out that the AUSA's testimony was not corroborated by the translator or one of the special agents.

47

*United States v. Bin Laden*, No. 98 Cr. 1023, 2001 WL 1160604, at *9 (S.D.N.Y. Oct. 2, 2001). In addition, the District Court found no cause for suspicion in the government's sole reliance on the AOR at the initial suppression hearing, explaining that it was "entirely understandable that the [g]overnment initially relied on the Advice of Rights form which had been used abroad extensively by [Assistant United States Attorneys] in the field without challenge." *Id.* It found "no bas[i]s whatsoever to support the claim that there was some manipulation of the suppression hearing process to obtain a tactical advantage." *Id.*

We see nothing erroneous—much less clearly erroneous—in either of these findings. The District Court concluded, based on its direct observation of the AUSA's demeanor and in light of the testimony offered, that the AUSA's testimony was credible. The District Court further determined that the "late" introduction of the evidence of the oral *Miranda* warnings was the product of the government's misapprehension of the validity of the AOR. As the District Court explained, the government had no reason to doubt that its AOR, which had been "used abroad extensively . . . without challenge," *id.*, would pass muster under *Miranda*, and it therefore would have been reasonable for the government to decline to call the AUSA—particularly in light of his status as one of the lead prosecutors on the case—to testify at the initial suppression hearing. Accordingly, it was reasonable to conclude that the government offered the AUSA's testimony at the reopened suppression hearings and not at the initial hearing because the need to offer that evidence became apparent to the government only after the District Court found the AOR inadequate under *Miranda*. Al-'Owhali disagrees and has set forth at length his alternative interpretation of the facts, as described above in the margin. But this disagreement does not demonstrate that the District Court's credibility determinations were clearly erroneous. Accordingly, we see no basis to disturb the District Court's finding that the AUSA also orally provided a conventional, and entirely adequate, *Miranda* warning to Al-'Owhali.

48

In addition, both Al-'Owhali and Odeh question whether the AUSA's oral warnings were sufficient to apprise them of their *Miranda* rights. They contend that the warnings were inadequate because the AUSA did not apprise them of whether they could obtain legal representation under Kenyan law. There is no merit to this contention. As explained above, *Miranda* does not require U.S. agents to become experts on foreign criminal procedure. For the same reasons that the AOR need not have delved into the rights of criminal defendants under Kenyan law, the AUSA's oral warning need not have explained (1) whether and how local defense counsel could be obtained and (2) whether and how local defense counsel, once obtained, could then participate in a custodial interrogation conducted under Kenyan auspices.

Al-'Owhali also urges that the oral warning by the AUSA was incapable of curing the flawed warnings contained in the AOR. In his view, the "contradictions" between the AOR and the oral warning were so jarring that he "could not have comprehended the warnings," and the statements that he made prior to receiving the oral warning "tainted" all that followed. Al-'Owhali Br. 100, 127. Because, as explained above, we see no serious flaw in the AOR and, therefore, nothing that needed to be "cured" by the oral warning, we reject this challenge. In addition, we see no contradiction between the AOR and the oral warnings insofar as both of them accurately described Al-'Owhali's rights under the U.S. Constitution and the need to look to local law for the effectuation of one of those rights.

      c.      Defendants' Waiver of their *Miranda* Rights and their Subsequent Statements

Al-'Owhali and Odeh contend that the conditions of their confinement made their *Miranda* waivers and subsequent statements involuntary. Al-'Owhali urges that his "secret and relentless interrogation . . . over a ten day period of incommunicado and solitary confinement in a Kenyan prison" renders all of the statements he made during his incarceration, including his *Miranda* waiver, involuntary. Al-'Owhali Br. 111, 125. According to Al-'Owhali, his "only chance to escape this prolonged isolation

and interrogation, and to have an attorney to consult, was to confess his involvement in the bombing, which would enable him to go to America, where he would have an attorney." *Id.* at 113. Similarly, Odeh argues that his "choice was not really between remaining silent or talking, but between talking to the Kenyans alone or talking to them and the Americans." Odeh Br. 88. The circumstances in which he made this choice were "disturbing," in his view, because he agreed to make a statement only after having been left alone with Kenyan police officers, whom he accuses of having a "reputation . . . for torture." *Id.* at 90. With respect to whether the waiver was knowing under the *Miranda* framework, Odeh argues that it was not because he did not "underst[and] that he had the option of delaying the interrogation for even a day or two in order to obtain counsel" and "was not provided with the option of speaking with the Jordanian consulate, or the chance to consult with his wife." *Id.* at 89-90.

We "will affirm a district court's conclusion that a defendant knowingly and voluntarily waived his constitutional rights if any reasonable view of the evidence supports it." *United States v. Burrous*, 147 F.3d 111, 116 (2d Cir. 1998) (citation and internal quotation marks omitted). Our inquiry into the knowing and voluntariness of a waiver is "directed to a defendant's state of mind, which can be inferred from his actions and statements." *United States v. Spencer,* 995 F.2d 10, 11 (2d Cir. 1993). The existence of a knowing and voluntary waiver does not, however, guarantee that all subsequent statements were voluntarily made. Accordingly, we cannot "dispense with the voluntariness inquiry" simply because we determine that a defendant's waiver was valid. *Dickerson*, 530 U.S. at 444. Nevertheless, as the Supreme Court has observed, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Id.* (citation and internal quotation marks omitted).

i.      The *Miranda* Waivers

We observe at the outset that Al-'Owhali was presented with the AOR, which he signed, within one hour of his arrest in Kenya. *See* Part I.A.1, *ante*. Initially read to him in English, the form was translated orally into Arabic in the afternoon of the same day, which was the first day of his detention. Accordingly, he executed a *Miranda* waiver within hours of his arrest, and therefore, his contention that his will was overborne by an extended period of detention runs counter to the facts. Similarly, on the second day of his detention, Odeh received the AOR, as well as an oral *Miranda* warning from the AUSA, and he signed the waiver the same day. The District Court found that Odeh's waiver was "not [the result] of any coercive conduct on the part of U.S. personnel" and "that he was driven to talk in order to distance himself from the embassy bombing." *Bin Laden*, 132 F. Supp. 2d at 213. Odeh's vague, unsubstantiated intimations on appeal that Kenyan personnel played some nefarious role in eliciting this waiver, *see* Odeh Br. 90 (noting "the reputation of the Kenyans for torture"), are not supported by the record, were not raised before the District Court, and are not sufficient, in any event, to disturb the District Court's factual findings. We therefore conclude that the *Miranda* waivers of Al-'Owhali and Odeh were executed voluntarily.

Turning to the question of whether the waivers were executed knowingly, we observe that only Odeh challenges the District Court's ruling on this score. The District Court found:

> Odeh told the Americans that he was comfortable speaking English and that he would ask clarifying questions if he did not understand his rights or anything else the agents said. At no time did Odeh indicate that he was experiencing comprehension problems during the interview sessions. Furthermore, AUSA [redacted] explained to Odeh his Miranda rights with a tremendous degree of conscientiousness, precision, and detail. Odeh himself asked AUSA [redacted] a number of follow-up questions concerning his rights, thereby revealing Odeh's grasp of the salient issues. Because Odeh fully appreciated the fact that he was the "boss" as to whether he would accede to questioning by Americans, we find Odeh's waiver to be knowing and intelligent.

*Bin Laden*, 132 F. Supp. 2d at 212-13 (redaction signals in original).

Odeh contends that his waiver was not knowing because he did not know that he could delay interrogation in order to obtain counsel and he was not offered the opportunity to contact his consulate or his wife. These assertions, even if true, have no bearing on whether Odeh's waiver was made knowingly. *Miranda* does not require that a suspect be informed that he may delay questioning, obtain assistance from his consulate, or contact his wife, and where a defendant's "voluntary decision to speak was made with full awareness and comprehension of all the information *Miranda* requires the police to convey, the waiver[ ] [is] valid." *Moran v. Burbine*, 475 U.S. 412, 424 (1986); *see also Fare v. Michael C.*, 442 U.S. 707, 722 (1979) (distinguishing "the request for counsel from the request for a probation officer, a clergyman, or a close friend. . . . [because the latter] simply is not necessary, in the way an attorney is, for the protection of the legal rights of the accused."). As a result, we reject Odeh's contention that his waiver was not made knowingly.

We therefore conclude that both Al-'Owhali and Odeh knowingly and voluntarily executed valid *Miranda* waivers.

### ii. The Voluntariness of the Statements

We now consider the question of whether the circumstances of Al-'Owhali and Odeh's confinement rendered their statements involuntary. In order to do so, "we must examine the totality of the circumstances. Specifically, these circumstances include 1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police." *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003) (citing *Tankleff v. Senkowski*, 135 F.3d 235, 245 (2d Cir. 1998)); *see also Dickerson*, 530 U.S. at 434 (describing the inquiry into "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession. . . . [as taking] into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation" (internal citation and quotation marks omitted)).

52

As described above, the District Court found that Al-'Owhali had a basic understanding of spoken English, received two years of university-level education, and was familiar with political and world events. *Bin Laden*, 132 F. Supp. 2d at 179. With respect to the conditions of his confinement, the District Court found that Al-'Owhali was held in "incommunicado detention" for fourteen days, at first in a ten-by-eleven foot cell and then in an eight-by-eight foot cell, and during this time, he received medical attention "as needed." *Id.* The District Court noted "[a] photograph of Al-'Owhali in his cell, taken at some point during his U.S. interrogation in Kenya, show[ing] him smiling and striking a triumphant pose." *Id.* at 193. The District Court described the interrogation sessions, which were "intermittent and reasonable in duration," *id.*, as follows:

> Al-'Owhali was never in handcuffs during any of his interviews in Kenya. All interviews were held in a library-like room fitted with tables and chairs. Frequent breaks were taken to allow Al-'Owhali to use the restroom, pray, and eat. Prayer breaks lasted for about 15 minutes. Bottled water was provided upon request; food was often provided by the agents. No threats were made by the U.S. agents, nor were any promises made.

*Id.* at 178-79 (numbering omitted). The District Court also took note of the "evidence that Al-'Owhali regarded his sessions with [an FBI agent] as a cat-and-mouse game between trained professionals." *Id.*

We have no reason to doubt the District Court's conclusion that Al-'Owhali was "a well-educated and intelligent individual . . . [whose] demeanor before the Americans was one indicative of confidence, not of intimidation." *Id.* at 193. Likewise, there is no evidence in the record suggesting that the conduct of Al-'Owhali's interrogators was oppressive; quite the contrary: they permitted breaks, provided food and water, limited the duration of the sessions, and never placed him in restraints. Indeed, Al-'Owhali does not appear to argue otherwise, as his challenge to the voluntariness of his statements centers primarily on the circumstances of his incommunicado detention in Kenya. The District Court found the conditions of his confinement, "although non-ideal . . . far from oppressive."

*Id.* Al-'Owhali argues, however, that the length of time he was held in detention imposed "terrible psychological and coercive pressures" on him. Al-'Owhali Br. 116.

Without minimizing in any way the potentially coercive effects of incommunicado detention lasting for fourteen days, we must consider this fact as only one data point—albeit a significant one—in our totality-of-the-circumstances analysis.[24] *Cf. United States v. Kiendra*, 663 F.2d 349, 351 (1st Cir. 1981) ("[S]olitary confinement [for thirty days] . . . cannot be presumed to have weakened [a suspect's] will to such an extent that he was incompetent to exercise his rights."). Weighing against the potentially coercive circumstances of Al-'Owhali's confinement are the District Court's careful findings of fact regarding Al-'Owhali's personal characteristics (his education, his knowledge of English and current events, and his demeanor) and the restrained conduct of his interrogators (who never resorted to threats, promises, or coercion to obtain information from him, and who informed him of his rights from the very beginning). In addition, we must consider the District Court's conclusion that

> what truly motivated Al-'Owhali to inculpate himself was his own overriding desire that he be tried in the United States. As he declared to the U.S. agents interviewing him, it was the United States which was his enemy, not Kenya. Particularly significant is the fact that the suggestion that he be tried in America was initiated entirely by Al-'Owhali. And when Al-'Owhali was dissatisfied by the less-than-firm assurances offered in the first DOU, he demanded that AUSA [redacted] do better.

*Bin Laden*, 132 F. Supp. 2d at 194. Taking into account the totality of the circumstances, as we must, we cannot conclude that, because Al-'Owhali was detained incommunicado for fourteen days, the statements he made after waiving his *Miranda* rights were involuntary. The District Court's clear finding that the conditions of Al-'Owhali's detention were not coercive is buttressed by strong evidence of Al-'Owhali's personal intelligence and resilience; the humane treatment he received from his interrogators; and his own acknowledgment that a desire to come to the United States to air his grievances, and not

---

[24] As noted earlier, incommunicado detention describes detention without contact with the outside world and is not to be confused with solitary confinement.

coercion, caused him to speak with U.S. agents. All of this evidence militates powerfully against the potentially coercive effects of his detention and in support of the findings of the District Court. For these reasons, we affirm the decision of the District Court that the statements made by Al-'Owhali while in Kenyan detention were voluntary.

Odeh does not argue explicitly that his post-warning statements were made involuntarily.[25] Nevertheless, his arguments directed generally against the voluntariness of his *Miranda* waiver apply with equal lack of force to the statements he made thereafter. The only question that concerns us in this regard is whether, unlike Al-'Owhali, Odeh's fourteen-day incommunicado detention rendered involuntary his post-warning statements. We conclude that it did not.

Like Al-'Owhali, Odeh was educated at the university level. *Bin Laden*, 132 F. Supp. 2d at 206. In addition, he speaks English and Arabic, and received military training and experience "for several years" in Afghanistan. *Id.* Odeh was held "incommunicado," like Al-'Owhali, for fourteen days in Kenyan custody. *Id.* at 205. During this time, there "were no threats or promises made," and Odeh does not allege that he was mistreated.[26] *Id.* As the District Court remarked, Odeh's detention "cannot be said to have induced his statements since he began confessing from the very first day of questioning." *Id.* at 213. We agree. Odeh began speaking with U.S. agents the day after he arrived in Kenya from Pakistan. *Id.* at 203. We need not speculate on his reasons for doing so, but that decision cannot be attributed to the coercive effects of a fourteen-day detention that was yet to come. Accordingly, we conclude that, in light of the District Court's findings regarding Odeh's personal characteristics, the absence of oppressive interrogation methods, and his decision to speak with U.S. officials immediately

---

[25] Before the District Court, Odeh argued in support of his initial motion to suppress that his treatment at the hands of the Pakistani authorities "was so heinous that a legitimate question arose as to whether Defendant's subsequent statements in Kenya were the 'fruit of the poisonous tree.'" Odeh Br. 62. He has not renewed that argument on appeal.

[26] As noted above, Odeh makes vague and unsubstantiated accusations about the reputations of the Kenyan police but does not claim that he was actually mistreated by them.

upon encountering them, Odeh's post-warning statements cannot be attributed to the coercive effects of his incommunicado detention.[27]

Accordingly, we conclude that the motions of Al-'Owhali and Odeh to suppress their inculpatory statements were properly denied by the District Court.

## III.    CONCLUSION

To summarize, we hold:

(1) The inculpatory statements of Al-'Owhali and Odeh that were obtained overseas by U.S. agents were properly admitted at trial because (a) the oral warnings of the federal prosecutor satisfied, and the "Advice of Rights" form signed by defendants substantially complied with, the government's obligations, insofar as it had any, under *Miranda v. Arizona*, 384 U.S. 436 (1966), and (b) the statements were not obtained involuntarily from defendants in violation of the Fifth Amendment;

(2) The District Court did not violate Odeh's Sixth Amendment right to counsel by permitting him to withdraw his initial suppression motion on religious grounds; and

(3) On a motion to reopen a suppression hearing, there is no bright-line rule that necessarily and invariably requires the government to provide a reasonable justification for its failure to offer relevant evidence at an earlier suppression proceeding.  Accordingly, the District Court did not abuse its discretion by reopening a suppression hearing at the government's request, notwithstanding the government's failure to provide a reasonable justification for not offering the evidence at an earlier proceeding because no such justification is required in all cases.

---

[27] While we do not foreclose the possibility that, after voluntarily choosing to make a statement, a suspect's subsequent incommunicado detention may overpower his ability to decide to discontinue speaking, we see no evidence in the record of that here.

For these reasons, and for those set forth in *In re Terrorist Bombings of U.S. Embassies in East Africa*, __ F.3d __ (2d Cir. 2008), the judgments of conviction entered by the District Court against Al-'Owhali and Odeh are **AFFIRMED** in all respects.